STATE of Missouri, Respondent,

v.

Elroy WILLIS, Defendant.

No. WD 54550.

Missouri Court of Appeals,
Western District.

Jan. 5, 1999.

As Modified March 2, 1999.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 2, 1999.

Application for Transfer Sustained
April 27, 1999.

Case Retransferred Oct. 26, 1999.

Court of Appeals Opinion Readopted
Nov. 4, 1999.

Irene Karns, Asst. Public Defender, Columbia, for defendant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

Before ELLIS P.J., LOWENSTEIN and RIEDERER, JJ.

RIEDERER, Judge.

Elroy Willis appeals from his conviction for one count of involuntary manslaughter. Appellant contends that the trial court abused its discretion in permitting the State to use two letters he wrote to his wife from prison in violation of Rule 25.03(A)(2). Because we find the use of the letters resulted in fundamental unfairness, we reverse and remand for a new trial.

## Factual and Procedural Background

On October 26, 1995, six weeks after the birth of her daughter Cyndee Willis, Cheryl Willis returned to work. Appellant, Cyndee's father, cared for the child at home while Cheryl was at work. On December 7, 1995, Cheryl left for work at approximately 7:30 a.m. During that day, Rivian Hutton, who lived in the apartment across the hall from Willis, was home ill. Between 11:00 a.m. and 12:00 p.m., the neighbor heard a thud like something falling or being thrown against the wall. She also heard Cyndee crying. Cheryl returned home from work at approximately 5:30 p.m. Appellant told Cheryl that Cyndee had had a bad day and that he did not want her to wake Cyndee since he just put her to sleep. Appellant soon left, after he borrowed some money and a bus pass from Cheryl. A short time after Appellant left, Cheryl went to check on Cyndee. Cheryl turned the light on in the baby's bedroom and called Cyndee's name. When Cyndee did not react, Cheryl put her face on the baby's face. Cyndee's face was cold. Cheryl then noticed white mucous running out of Cyndee's nose and mouth. Cheryl wiped off the mucous and pulled the covers back to determine if Cyndee was breathing. When Cheryl determined that Cyndee was not breathing, she picked her up and attempted to resuscitate her, which only brought up more mucous. Cheryl then ran to Hutton's apartment to call for paramedics. The paramedics responded and ultimately took the baby to the hospital. Ten minutes after arriving at the hospital, Cheryl was told that Cyndee was dead.

Another neighbor, Teresa Lee, noticed Appellant walking up the street in front of the apartment building at approximately 1:00 p.m. that day. She saw Appellant again around 6:00 p.m., standing on the side of the apartment building across from his own. About this time, Lee heard sirens and saw someone flagging down emergency vehicles. Lee said that although it was clear that the paramedics were going into Appellant's apartment, Appellant remained on the side of the building and watched. Lee then saw Cheryl come out of the apartment building along with the paramedics carrying the baby. They walked right past Appellant and did not see him. Around 7:00 p.m., Appellant rode the bus to the hospital.

Officer Keli Theison and Detective Joseph Crayon of the Kansas City Police Department interviewed Cheryl and Appellant at the hospital. Appellant said that the baby had vomited a white substance that afternoon, that he had put the baby down for a nap around 4:45 p.m., and that he had checked on her around 5:20 p.m.

On the following morning, the Jackson County Medical Examiner, Dr. Thomas Young, performed an autopsy on Cyndee's body. The autopsy revealed blood clots over the surface of the baby's brain, a subarachnoid hemorrhage, an epidural and subdural hemorrhage in her spine, retinal hemorrhages in both her eyes, healing posterior rib fractures on both sides and multiple healing fractures in her arms and legs. Dr. Young concluded that the cause of death was a closed head injury which is characteristic of shaken baby syndrome. Dr. Young also determined that the death was not accidental. He found that the injuries the baby sustained are characteristic of shaken baby syndrome and that a

great deal of force, "a very severe whiplash type of injury event" would be necessary to cause the type of injuries the baby sustained. Dr. Young also said that the injuries happened recently, because after sustaining these injuries, the baby would not be alert, and would not eat, awaken, or respond.

Three days later, on December 10, 1995, Detective Barrios, Detective Thompson and Detective Pruetting of the Kansas City Police Department went to the Willis residence and asked Cheryl and Appellant to come with them to the police station for questioning. Cheryl and Appellant were each questioned separately at police headquarters.

Appellant was informed of his *Miranda* rights. Appellant stated that he understood his rights and then signed and initialed a *Miranda* waiver form. Appellant was interviewed on videotape. Approximately an hour into the interview, Appellant stated that he was playing with Cyndee, throwing her up in the air and catching her when he dropped her and she hit the floor. Appellant also stated that he attempted to perform CPR.

On the day the trial started, the court conducted a pre-trial hearing on defense counsel's motion to suppress statements. During the hearing, Appellant was called to testify about his statements to the police. Appellant testified that he had made up the story about dropping the baby, in order to protect Cheryl. The prosecutor, in her cross-examination, began referring to two letters Appellant wrote to Cheryl from prison. In the letters, Appellant wrote that he was sorry and that dropping the baby had been an accident. The State moved to admit the letters as State's Exhibit C for purposes of the hearing only and claimed that, until Appellant said his statements to the police were made up, it had not intended to use the letters. The letters were admitted for purposes of the hearing, and the motion to suppress was denied. Jury selection commenced. The next morning, before the trial began, Appellant objected to the State's use of the letters during the trial on the basis that the State had failed to disclose the letters timely and had thus violated the rules of discovery. The State justified its failure to disclose the letters by claiming that it did not intend to use the letters unless Appellant testified. Defense counsel's objection to the use of the letters was overruled. Defense counsel also objected to the use of the letters prior to Appellant's testimony. The trial court determined that the State had not complied with Rule 25.03(A)(2), but that Appellant was not prejudiced. At trial, Appellant testified, and the two letters were used by the State as a significant part of cross-examination. After the case was submitted, the jury sent a note to the judge during its deliberations asking to view the letters. Since the letters had not been admitted, the judge did not allow the jury to see the them.

## I.

Appellant claims in his sole point on appeal that the trial court abused its discretion in permitting the State to use the two letters Appellant wrote to his wife from prison. Appellant maintains that the State failed to disclose the letters until the day of trial in violation of Rule 25.03(A)(2), and that the delay disabled the defense to which he was already committed and that the failure to timely disclose the letters affected the verdict.

### A. Standard of Review

The determination of whether the State violated a rule of discovery rests within the sound discretion of the trial court. *State v. White,* 931 S.W.2d 825, 832 (Mo.App.1996). If a discovery violation occurs, the trial court also has discretion in selecting an appropriate remedy. *Id.* We review the trial court's ruling for an abuse of discretion. *Id.* An abuse of discretion occurs where the remedy selected results in fundamental unfairness to the defendant, or the outcome of the case has been altered. *State v. Scott,* 943 S.W.2d 730,

735 (Mo.App.1997). "Fundamental unfairness" turns on whether there was a reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of the trial. *Id.* Here, the trial court found that the State violated discovery Rule 25.03(A)(2). Thus, we must determine whether there was a reasonable likelihood that an earlier disclosure of the requested evidence would have affected the result of the trial.

### B. Discussion

While Appellant was held in jail, he wrote Cheryl two letters, one on December 16, 1995, and one on December 17, 1995. In the letters, Appellant wrote that he was sorry for accidentally dropping their daughter. He also wrote that "[he] should have taken her to the hospital when she first fell instead of waiting like an idiot thinking she was alright." In the second letter he wrote, ". . . dancing with her oh she loved that so much, especially on certain songs where we'd dip, and twirl around, then I'll do my little toss, but, somehow my feet either became to [sic] left feet or I got caught up in those raggy tennis shoes and dropped my baby and fell, but, she seemed to have been okay, I tried to get her to respond for a minute she didn't I panic [sic] and started trying to give her CPR it wasn't probable [sic] administered properly but, I tried anyway but, she was not deceased then I know that for a fact." This recitation in the letters is essentially what Appellant told the police during the videotaped interview three days after the baby's death. The letters were written on the sixth and seventh day after the videotaped statement.

■ The trial started on April 21, 1997, and at a suppression hearing that same day, Appellant testified that the statements he made to the police about dropping his daughter were made up to protect his wife. Up until that point, the State had never disclosed the existence of the two letters Appellant wrote his wife from jail. Appellant objected to the use of the letters before the trial began and again before he testified, claiming that the State

had violated Rule 25.03(A)(2), which provides:

> Except as otherwise provided in these Rules as to protective orders, **the state shall**, upon written request of defendant's counsel, **disclose** to defendant's counsel such part or all of the following material and information within its possession or control designated in said request:
>
> (2) **Any written** or recorded **statements** and the substance of any oral statements **made by the defendant** or by a co-defendant . . . (emphasis added).

The trial court ruled that while the State violated Rule 25.03(A)(2), Appellant had not been prejudiced. Appellant objected and properly preserved the issue. We must now determine whether the failure to disclose the letters amounted to fundamental unfairness to Appellant. *Scott*, 943 S.W.2d 730 at 735.

Appellant argues that the late discovery of the letters crippled his defense, because he had planned to testify that he made up his statements to the police to protect his wife. Appellant claims that not testifying would have been the only possible modification he could have made to his trial strategy. Given his options, Appellant chose to testify.

This case is similar to *Scott*, 943 S.W.2d 730, decided by this court last year. *Scott* was charged in Marion County under § 569.070 with breaking or causing the West Quincy Levee on the Mississippi river to fail, resulting in the flooding of some 15,000 acres of land and the destruction of over 100 buildings. On the second day of trial, early in the presentation of its evidence, the State sought to question two witnesses about statements made by Scott after the levee failure. These statements indicated that Scott wanted to cause a flood so his wife would be trapped on the other side of the river and he would be free to party. The prosecution disclosed to Scott the identity of the witnesses but gave no indication of the inculpatory state-

ments. The prosecutor explained to the trial court that he had just recently been told of the inculpatory statements when he interviewed the witnesses.[1] The prosecutor told the court that he did not feel obligated to disclose the inculpatory part of their testimony to Scott. The court allowed defense counsel to interview the witnesses, one of whom told defense counsel that he had given this information to the police a month earlier. The trial court ruled that the prosecutor had violated Rule 25.03(A)(2), rendering the testimony inadmissible in the State's case-in-chief, but allowed that such testimony could be used as rebuttal if the defendant took the stand. Scott argued that the trial court's ruling deprived him of a fair trial because he planned to testify and to use an expert, neither of which was now possible. *Id.* at 736.

This court in *Scott*, ruled that, "exclusion of the inculpatory statement during the State's case was not sufficient to remove the prejudice to the defendant in preparing for and trying the case." *Id.* at 739. "Even though the defense was shaky and the evidence strong against the defendant, he was still entitled to a trial, a defense, and to prepare to testify and be cross-examined." *Id.* The court in *Scott* was painfully aware of the dilemma posed, noting, "If clear violations are condoned, then any unfairness, even the accused's due process rights, can be swept aside by saying the evidence against the convicted person was so strong there would be no change in the outcome." *Id.* The court further remarked that "[e]ven if Scott receives the same result on retrial, the system demands a retrial." *Id.*

The court in *Scott* reviewed 25 years of decisions regarding discovery violations in criminal cases, including *State v. Harrington*, 534 S.W.2d 44 (Mo. banc 1976). In that case, the defendant was interrogated by the police and then charged with murder. Defendant was also interrogated by

the FBI. He told them the shooting was accidental. This FBI statement was never given to defense counsel until the day the trial started, just before jury selection began. The trial court allowed the State to use the FBI statement. The Missouri Supreme Court reversed, holding that, "under the circumstances of this case, the failure of the State to deliver a copy of defendant's statement to his attorneys *prior to trial* was fundamentally unfair and resulted in prejudicial error." *Id.* at 48. (emphasis in original). Our case is very similar. The undisclosed statements were those of defendant himself. Second, the undisclosed statements were in the hands of the State, and the prosecutor failed to provide them to defense counsel until the day of trial, just before the beginning of jury selection. Third, even though the undisclosed statements were not inculpatory, they were a direct contradiction of the defense which defendant planned to present. Fourth, defense counsel was forced to prepare its defense without knowledge of the undisclosed statements, while the State had full knowledge of them and used them as a part of its case. Finally, the prosecutor sought to justify the earlier non-production of the undisclosed statements by saying they were not incriminating, that the defendant knew about the statement and defense counsel could have found out about them by aggressive investigation.

The court in *Harrington* stated, "We start with the premise that truth is revealed by a decent opportunity to prepare in advance of trial." *Id.* at 46. (quoting, *Cicenia v. La Gay*, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958)). "[W]e strive for practices which will best promote the quest for truth." *Id.* at 47. "It is difficult to understand why a defendant should be denied pretrial inspection of his own statement in the absence of circumstances affirmatively indicating disservice to the public interest." *Id.* "No one would deny a defen-

---

1. One witness was interviewed a week before trial and the other one the morning of the    second day of trial.

dant's right thoroughly to investigate the facts of the crime to prepare for trial of that event." *Id.* "The need for an opportunity to prepare to deal with a defendant's statement must be evident." *Id.* "Simple justice requires that defendant be permitted to prepare to meet what looms as the critical element of the case against him." *Id.*

In *State v. Childers*, 852 S.W.2d 390, the State failed to produce the substance of oral statements made by the defendant to security guards.

> Statements made by a defendant which are inculpatory are almost by definition prejudicial. A defendant is entitled to know before trial, after request, what evidence of that sort is to be introduced by the state. Failure to supply such information is a violation of Rule 25.03 and **cannot be condoned.**

*Id.* at 391–2 (emphasis added).

In *State v. Perkins*, 710 S.W.2d 889 (Mo. App.1986), the State introduced evidence of defendant's alibi statement which was not disclosed until during voir dire, "and as a result he was unable to adequately prepare his defense." *Id.* at 891. The statement of the defendant was not inculpatory, but it "was inconsistent with [defendant's] trial theory ..." *Id.* at 893. The court noted:

> The quest of pre-trial discovery is not merely to assist the defendant or the state but to arrive at the truth. Here, the quest was aborted by the state's failure to disclose the alibi statement. Defendant was unable to prepare his defense because of the state's violation of Rule 25.03. The trial court's failure to order an appropriate sanction constituted an abuse of discretion, **resulting in fundamental unfairness** to the defendant.

*Id.* at 894 (emphasis added).

Even where the discovery violation involved merely failure to disclose a witness to whom the defendant had made incriminating statements, the use of the testimony "totally destroyed the defense of self-defense." *State v. Kehner*, 776 S.W.2d

396, 397 (Mo.App.1989). The court remarked, "[t]he basic object of the discovery process in criminal proceedings is to permit the defendant a decent opportunity to prepare in advance of trial and avoid surprise, thus extending to him fundamental fairness which the adversary system aims to provide." *Id.* (citing, *State v. Scott*, 647 S.W.2d 601, 606 (Mo.App.1983)). "The rules of criminal discovery are not mere etiquette nor is compliance discretionary." *Id.*

Our courts have consistently reversed convictions based on a defendant's statement which prosecutors failed to disclose in violation of Rule 25.03(A)(2). Nevertheless, the State argues that the conviction should not be reversed because there was no prejudice to Appellant.

■■ The State correctly argues that this court should reverse the judgment of conviction only where a defendant demonstrates that the State's failure to make a timely disclosure results in fundamental unfairness. *State v. Holmes*, 823 S.W.2d 55, 58 (Mo.App.1991). The State cites *State v. Foulk*, 725 S.W.2d 56, 69 (Mo.App. 1987) and argues that fundamental unfairness is measured by whether the earlier disclosure of the evidence would have affected the result of the trial. While the court in *Foulk* did make that observation, it is important to note that the court in *Foulk* actually held that the discovery violation issue in that case had not been preserved for appeal. *Id.* The State claims that it had disclosed its intention to use the letters to impeach Appellant two days prior to his testimony at trial. However, the disclosure did not come until the day the trial started. At that point, Appellant and his counsel had already committed to a defense, which was constructed without the benefit of the letters in question. Appellant is entitled to "a decent opportunity to prepare in advance of trial." *Harrington*, 534 S.W.2d at 46; *see also Childers*, 852 S.W.2d at 391. The State in effect, argues that although it was allowed sixteen months to prepare its case using

the letters, two days was sufficient for Appellant.[2] This is fundamentally unfair.

The State also argues that "defense counsel admitted to the court that he would have that time [two days] to adjust his defense strategy accordingly." The record, however, reflects that defense counsel never admitted to the court that he would have that time to adjust his defense strategy accordingly. Defense counsel stated that he would "definitely have more meetings with [his] client to try to prepare a defense that would respond to the letters." The record reveals the following colloquy after Appellant's counsel interposed his objection and the State argued against the objection:

Court: What you're basically saying is the problem is you had no knowledge these were going to try to be used until yesterday?

Defense Counsel: Right.

Court: We expect this to last a total of four days. During this interim what is the problem with you taking time to develop whatever you need to respond to the request for the State to use these letters?

Defense Counsel: Well I'm definitely going to have more meetings with my client to try to prepare a defense that would respond to the letters.

Court: But the State does not plan to use these letters unless he testifies?

Prosecutor: That's correct.

Court: Okay, at this time I'll deny your objection.

Defense counsel did not admit he would have two days to adjust his trial strategy. Rather, he acknowledged that he had no choice but to prepare a new defense, at the last moment, "to respond to the letters." This is fundamentally unfair.

■ The State next argues that Appellant never requested a continuance on the basis of the State's late disclosure, citing *State v. Enke*, 891 S.W.2d 134, 138 (Mo.

App.1994), for the proposition that Appellant's failure to request a continuance can be properly considered by the appellate court in determining whether the trial court abused its discretion. However, *Enke* is readily distinguished from our case. First, *Enke* involved a discovery request regarding a witness, not a statement of the defendant, and therefore did not involve Rule 25.03(A)(2). Second, the witness had been disclosed months before the trial. Third, *Enke* actually referred to the failure to seek a continuance to interview a doctor. Here, there is no one to interview. A continuance of a few hours could not remedy the problem created by the State's failure to abide by the discovery rules. We find that under the circumstances of this case, Appellant's failure to ask for a continuance has no bearing on whether the State's discovery violation resulted in fundamental unfairness to Appellant. Furthermore, we emphasize that failure to produce a statement of the accused is in a different category from failure to disclose a witness or a photograph. "[I]nculpatory statements, carrying such great weight with the jury, demand disclosure, and violations of the rule of disclosure examined with grave suspicion." *Scott*, 943 S.W.2d 730 at 739 (citing, *State v. Scott*, 479 S.W.2d 438 (Mo.banc. 1972)).

The State argues further that Appellant wrote the letters in question and, therefore, "the State cannot be faulted for nondisclosure of matters that Appellant was aware of." *State v. Calvert*, 879 S.W.2d 546, 548 (Mo.App.1994). However, *Calvert* is not on point. It was a *Brady* case, and it involved the failure of the State to disclose the inconsistent statement of the victim. *Calvert* had nothing to do with Rule 25.03(A)(2) or the failure to disclose the statement of a defendant. Further, the court in *Calvert* found that the statement in question had in fact been disclosed long before trial. *Id.* Finally, there is good reason not to extend this principle to cases regarding Rule 25.03(A)(2). In the case at

---

**2.** The two days the State refers to are the two days Appellant and his counsel were engaged in defending the case.

bar, the prosecutor argued to the trial court that "these are letters which the defendant wrote himself, so in actuality he would have knowledge of letters that he wrote to Cheryl Willis, his wife. It doesn't come as a surprise to defense counsel . . ." [3] If the State can be forgiven its duty to disclose a statement of the accused on the basis that the accused must have already known about the statement because he made it, then we will have eviscerated Rule 25.03(A)(2).

The State also contends that Appellant was not prejudiced by the State's use of the letters because the evidence was merely cumulative, and thus admission of the letters did not create fundamental unfairness to Appellant. The State cites *State v. Reichert*, 854 S.W.2d 584, 597 (Mo.App. 1993), claiming that where letters are cumulative of witness testimony, and when new issues are not introduced by the letters, the impeaching evidence from the letters do not harm Appellant. However, *Reichert* involved the failure to provide discovery of photographs and it did not involve Rule 25.03(A)(2). The court in *Reichert* stated, "[t]he photographs were cumulative of other evidence and did not introduce new issues which had not otherwise been thoroughly described by the witnesses." *Id.* In the present case, Appellant's letters were not cumulative. On the contrary, they contradicted the core of Appellant's defense. Even though *Reichert* does not apply to this case, we note that the court in *Reichert* did offer the caveat that, "[its] opinion should not be construed as an endorsement or encouragement for any violation of Rule 25. Our opinion that there has been no abuse of discretion requiring a new trial is based upon the circumstances of this particular case." *Id.* at 598 (citations omitted).

The State also argues that "a defendant's own statements which were not revealed pursuant to discovery may be used in rebuttal of the defendant's own testimo-

ny." *State v. Robinson*, 832 S.W.2d 941, 944 (Mo.App.1992) (citing, *State v. Stuckey*, 680 S.W.2d 931, 937 (Mo. banc 1984)) (citing, *State v. Barton*, 593 S.W.2d 262, 264 (Mo.App.1980)).

*Robinson* cites *Stuckey* for this quoted proposition. However, *Stuckey* involved the use of an expert's statement in rebuttal, and the quoted material is but dicta. *Stuckey*, in turn, cites *Barton* for this proposition. *Barton* does not use that language and actually only holds that the remedy for failure to produce discovery is within the sound discretion of the trial court. *Id.* at 264. We agree. However, as the State concedes, that discretion is abused where the use of the statement results in fundamental unfairness. Regardless, the *Robinson* case is not controlling, for the statements of the defendant used in rebuttal in that case were not statements taken as part of the case being tried and were not, therefore, subject to discovery.

The State also cites *State v. Bea*, 509 S.W.2d 474, 476 (Mo.App.1974) as follows:

[A]ny material prior inconsistent statements may be shown to impeach the defendant's credibility, and the shroud of protection given defendant by sustaining his motion to suppress because of a breach of duty on the part of the state should not be perverted into a license for a defendant to use perjury by way of a defense, free from the risk of confrontation with prior material inconsistent utterances.

The court in *Bea* offers no authority for support, other than analogy to *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which involved a statement suppressed under the Fourth Amendment and is not controlling under our facts. Further, in making this argument, the State fails to recognize its obligation to provide this information, and instead focuses on the possibility that the defendant may perjure himself. The de-

---

**3.** Defense counsel immediately interposed an argument that indeed it was a surprise to him, further buttressing our belief that de-

fense counsel prepared Appellant's defense without the benefit or knowledge of these statements.

fendant would not be "free from the risk of confrontation with prior material inconsistent utterances" if the State had conformed to its obligations. The defendant in *Bea* specifically denied the content of the statements and the court allowed rebuttal because "to hold otherwise is to permit defendant to assume a virtue which according to the evidence he possessed not." Id. at 471. That cannot be said of the evidence here. *Bea* does not apply.

Finally, the State cites *State v. Foulk*, 725 S.W.2d 56 at 69, arguing that no fundamental unfairness resulted because there was ample and strong evidence of Defendant's guilt. In *Foulk*, the defendant had written a letter from jail while awaiting trial. The letter "could be read as a plan for escaping from the Cape Girardeau Jail." Id. at 68. Defendant claimed that the trial court erred by admitting the letter into evidence because of the violation of the discovery rules. The defendant claimed that the first time the State produced the letters was on the morning of trial. However, the record on appeal revealed that the accused had never objected to the admission of the letter based on a discovery rule violation, and that the court found that the issue was not preserved for appeal. Id.

The fact that evidence of guilt is strong is not a sufficient reason by itself to allow the State to use the letters written by Appellant when they have been withheld from him in direct violation of the rules of discovery. *State v. Scott*, 943 S.W.2d 730, 739 (Mo.App.1997). "Even though the defense was shaky and the evidence strong against the defendant, he was still entitled to a trial, a defense, and to prepare to testify and be cross-examined." Id. We also note Judge Somerville's admonition from *State v. Charles*, 572 S.W.2d 193, 199 (Mo.App.1978):

Although "harmless error" is frequently seized upon as a panacea for the improper admission of evidence, the exhibit in question cannot be lightly brushed off on that basis. This court firmly subscribes to the dual proposition that error associated with the improper admission of evidence should never be declared harmless unless it can be said to be so without question, and that in order to declare so the record should demonstrate that the jury disregarded or was uninfluenced by the improper evidence. (citations omitted). So construed, the improperly admitted exhibits impinged in defendant's alibi defense and their admission appears to fall within the condemnatory bounds of a general principle espoused by the Texas courts that reversible error is committed by the admission of improper evidence which impinges on a defense interposed by an accused. (citations omitted).

■ We believe, after a thorough review of the record, that the State's use of the letters written by Appellant resulted in fundamental unfairness. Fundamental unfairness can be found where the defendant has shown that the statement was of such character that a reasonable likelihood existed that it could have affected the outcome of the trial. *State v. Perkins*, 710 S.W.2d 889 at 893.

There is a reasonable likelihood that the use of the letters in this case could have affected the outcome of the trial. First, the letters were a substantial portion of the State's case. The prosecutor made a skilled and artful use of the letters on cross-examination, which accounted for eleven pages of the trial transcript. Second, the prosecutor made substantial use of the letters in her closing argument, once again skillfully weaving this evidence into her argument as to why the jury should convict Appellant. Third, the jury clearly found the letters to be an important part of the case. After the jury was retired to consider its verdict, they sent a note to the trial judge requesting that they be allowed to look at the letters.[4] The importance the

---

4. Since the letters were never actually admitted into evidence, the court would not allow the jury to see the letters.

State placed on the letters in cross-examination and in closing argument, along with the importance the jury placed on the letters in its deliberations, leads inexorably to the conclusion that a reasonable likelihood exists that use of the letters could have affected the outcome of the trial.

We do not reach this conclusion lightly. This is a heinous crime and there is strong evidence of guilt. However, the rules of discovery are not mere etiquette. *Scott,* 943 S.W.2d 730 at 735. Further, the position of the public prosecutor is one of profound importance in our criminal justice system, for in it reposes the awesome power of the State and the protection of the people. It is a high calling and a position of great trust. We are mindful of the words of Justice Sutherland in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), which equally apply to the prosecuting attorney for the State:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

The discovery violation in this case resulted in fundamental unfairness to this Appellant. We reverse the judgment of conviction and remand this case for a new trial.

Reversed and remanded.

ELLIS, P.J. and LOWENSTEIN, J., concur.