STATE of Missouri, Plaintiff–Respondent,

v.

Orlandis FARR, Defendant–Appellant.

No. 23898.

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 31, 2001.

Motion for Rehearing or Transfer Denied
Jan. 16, 2002.

**518**

Ellen H. Flottman, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Andrea Mazza Follett, Assistant Attorney General, for Respondent.

PHILLIP R. GARRISON, Presiding Judge.

Orlandis Farr ("Defendant") was charged with murder in the first degree in violation of Section 565.020.1,[1] armed criminal action in violation of Section 571.015, and robbery in the first degree in violation of Section 569.030. A jury found him guilty of robbery in the first degree, and he was sentenced to ten years imprisonment. Defendant appeals.

Defendant does not challenge the sufficiency of the evidence supporting his conviction. The evidence, therefore, viewed in the light most favorable to the verdict, shows the following:

On the night of June 5, 1998, Michael Hatcher ("Hatcher") drove a red Pontiac Grand Am to a friend's house, and met with Darius Nicholson ("Nicholson"), Michael Bell ("Bell"), and Defendant. There, they smoked marijuana and/or used cocaine. Later, they left the home, and decided to get some fast food. On the way, Nicholson suggested that they rob Kellett

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

Oil Company ("Kellett Oil"), a Sikeston, Missouri gas station.

Hatcher, Defendant, and the others parked their car in an alley near Kellett Oil. Hatcher wore a red bandana across his face, and Defendant and Bell wore blue bandanas and hats. Nicholson carried a gun into the store, and Hatcher ran inside and took the money from the store clerk, Charles Garrett ("Garrett"). As Hatcher ran back outside, he passed Bell, who was standing just outside of the store, and saw Defendant, who appeared to be acting as a lookout. Hatcher then heard a gunshot, fell to the ground, and saw Nicholson and Bell run around the building. Hatcher stood up, saw that Garrett was lying on the floor, and ran to catch up with his friends at the car. By that time, all of the men, except Hatcher, had disposed of their bandanas and hats. As Hatcher drove away from the alley, Bell snatched Hatcher's bandana and threw it out of the window. Hatcher dropped Nicholson off at his grandmother's house, then continued back to his friend's house. Hatcher did not know where Defendant and Bell went, but before they left, Bell gave Hatcher some money and said, "This is yours."

At approximately 2:50 a.m., a 911 dispatcher received a call, but the caller said nothing. The 911 telephone registry system indicated that the call came from a pay telephone at Kellett Oil. When the police arrived at the scene, they found Garrett lying on the ground, and observed that the cash register drawer was missing. Garrett was transported to a local hospital, but died later that morning. An autopsy revealed that a single bullet had passed through Garrett's left wrist, entered his chest near his armpit, passed through his upper lung, and lodged in his right ventricle. Officers searched the area around Kellett Oil and found a white t-shirt and a red bandana. In an alleyway near Kellett

Oil, they also discovered a set of tire tracks and found a blue bandana, baseball cap, and a gun.

An impression of the tire tracks was made, and it was determined that a 1988 Firestone Firehawk SS tire created the tracks. It was also determined that the bullet recovered from Garrett's body was fired by the gun found at the scene. Additionally, a hair fragment that belonged to an African–American was found on the baseball cap recovered from the alleyway.

The day after the robbery, Bell approached Hatcher, gave him some money, and told him to give it to Nicholson. Bell also told Hatcher that Garrett was dead, but told him not to tell Nicholson because he knew that Nicholson was the shooter and thought Nicholson might "go crazy."

Approximately six weeks after the Kellett Oil robbery, the Cape Girardeau Police Department contacted Detective Mark Croker ("Detective Croker") of the Sikeston Police Department and informed him that a similar robbery had occurred in Cape Girardeau. Detective Croker drove to the Cape Girardeau police station and learned that they had taken Jermaine Harrington ("Harrington") and Reginald Hatchett ("Hatchett") into custody. Detective Croker spoke with Harrington, but Harrington did not provide any information regarding the Kellett Oil robbery. Later, Detective Croker spoke again with Harrington and Hatchett, and based upon the information provided, Detective Croker told the Sikeston police to locate Hatcher and placed a "lookout" order on Nicholson. Harrington and Hatchett also told Detective Croker that Hatcher drove a red Pontiac Grand Am. Detective Croker located the car and had it towed. The Pontiac Grand Am had Firestone Firehawk SS tires.

Hatcher learned that the police were looking for him, and on the evening of July

16, 1998, he went to the police station and spoke with Detective Croker. Hatcher denied any participation in the robbery, but the police placed him under arrest. During subsequent questioning, Detective Croker told Hatcher that the police could not eliminate his car from being present at the scene of the crime, but that their information did not indicate that Hatcher was the shooter. Hatcher continued to deny participation in the robbery, but admitted he was in his car on the night of the incident. After some discussion regarding the length of time Hatcher might have to serve in connection with the crime, Hatcher admitted that he, Nicholson, and "some guy from Malden" participated in the robbery. Subsequently, Nicholson was arrested in connection with the robbery.

Several weeks later, Hatcher's attorney told Detective Croker that the man from Malden, Missouri was named "Landis." On September 15, 1998, Detective Croker showed Hatcher Defendant's yearbook photograph, and Hatcher identified Defendant as the man from Malden. Hatcher also stated that Defendant "hung around" Agnes Street, the same street where Bell lived. Based on that information, Detective Croker applied for warrants for Bell and Defendant.

Soon, thereafter, Detective Croker spoke with both the Malden Police Department and Defendant's father, Vincent Dennis ("Dennis"), in an attempt to contact Defendant. Detective Croker arranged for Dennis to bring Defendant to the Malden police station for an interview, but on the appointed day, Dennis arrived alone. Dennis told Detective Croker that during the weekend of the robbery Defendant had stayed with Bell in Sikeston, Missouri, and Defendant and Bell had both been working for Interim Personnel. After Detective Croker explained that Defendant had been

implicated in the Kellett Oil robbery, Dennis stated that he would talk to Defendant over the weekend and call Detective Croker on the following Tuesday. However, Dennis did not call Detective Croker, and Dennis later refused to speak to a Malden police officer.

As the investigation continued, DNA samples from Defendant, Hatcher, Nicholson, and Bell were compared with samples taken from the seized t-shirt and bandanas to determine possible DNA matches. The t-shirt revealed a mix of DNA from Nicholson and an unknown individual.

In September 1999, Defendant was arrested and charged with murder in the first degree, armed criminal action, and robbery in the first degree. At the trial, Defendant and his co-defendant, Bell, testified. The jury found Defendant not guilty of murder in the first degree and armed criminal action, but found him guilty of robbery in the first degree. Defendant appeals.

In his first point on appeal, Defendant contends that the trial court erred in admitting State's Exhibit 47, Defendant's job application filled out at the Sikeston office of Interim Personnel on May 30, 1998, and in allowing the State to cross-examine him about it because the State failed to disclose the job application to defense counsel upon a request for disclosure, in violation of Rule 25.03(A)(2).[2]

Defendant lived in Malden, Missouri. Bell, who is Defendant's cousin, and Bell's mother, Jane Bell, lived in Sikeston, Missouri, where the robbery occurred. A large part of Defendant's defense to the charges against him was that he never went to Sikeston except on family occasions. Several family members testified that Defendant never went to Sikeston except on family occasions because he had once been beaten up there. Defendant

---

2. All rule references are to Missouri Rules of Criminal Procedure (2001).

also testified that he was not in Sikeston from June 4–6, 1998, and that he was not involved in the robbery. On cross-examination, the prosecutor asked him if he had applied for a job through Interim Personnel in Sikeston. Defendant said that he did not have anything to do with the Sikeston office, and that he worked out of the Popular Bluff office while looking for a job in Malden. He testified that Interim Personnel called him once for a job in Sikeston, but he never went. At this point, the State produced State's Exhibit 47, a job application filled out by Defendant at Interim Personnel in Sikeston on May 30, 1998. The application was signed by Defendant, and gave his address as 848 Agnes in Sikeston, which was Bell's address. This application had not been disclosed to defense counsel.

Defense counsel objected under Rule 25.03(A), which provides that "the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request: ... (2) Any written or recorded statements ... made by the defendant...." The trial court overruled the objection, holding that State's Exhibit 47 did not fall "within the context of a statement that would be required to be disclosed."

■ Here, the State agrees that Defendant's job application is a statement pursuant to Rule 25.03(A)(2). However, it argues that the job application need not have been previously disclosed to the defense because it may be used in order to impeach Defendant without violating Rule 25.03(A)(2). In support, the State cites *State v. Robinson*, 832 S.W.2d 941 (Mo. App. E.D.1992), and *State v. Bea*, 509 S.W.2d 474 (Mo.App. E.D.1974).

In *State v. Willis*, 2 S.W.3d 801, 808 (Mo.App. W.D.1999), the court found that *Robinson* and *Bea* did not stand for the principle that "a defendant's own statements which were not revealed pursuant to discovery may be used in rebuttal of the defendant's own testimony." In *Willis*, the state argued that it did not violate Rule 25.03(A)(2), and justified its failure to disclose two inculpatory letters written by the defendant while in jail by claiming that it did not intend to use the letters unless the defendant testified. At trial, the defendant testified, and the letters were used by the state as a significant part of cross-examination. The *Willis* court held that the state's failure to disclose the inculpatory letters was a discovery violation. *Id.* at 809. In reaching that conclusion, *Willis* hexamined both *Robinson* and *Bea*, and found them not to be controlling. *Willis* found the *Robinson* case inapplicable because the statements of the defendant used in rebuttal were not statements taken as part of the case being tried, and were not, therefore, subject to discovery. *Willis*, 2 S.W.3d at 808. Further, it examined the statement in *Bea*, 509 S.W.2d at 476, which the State also relies on in the instant case, that

> any material prior inconsistent statements may be shown to impeach the defendant's credibility, and the shroud of protection given defendant by sustaining his motion to suppress because of a breach of duty on the part of the state should not be perverted into a license for a defendant to use perjury by way of a defense, free from the risk of confrontation with prior material inconsistent utterances.

The *Willis* court noted that *Bea* offered no authority in support of this statement, other than an analogy to *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which was not controlling as it dealt with suppression under the Fourth Amendment. *Willis*, 2 S.W.3d at 808.

■ We agree with the holding in *Willis*. The purpose of discovery is to

give a party a decent opportunity to prepare in advance of trial and to avoid surprise. *Willis*, 2 S.W.3d at 806; *State v. Petty*, 967 S.W.2d 127, 137 (Mo.App. E.D. 1998). The rules of criminal discovery are not mere etiquette nor is compliance to be at the discretion of the parties. *Petty*, 967 S.W.2d at 137. "A defendant is entitled to know before trial, after request, what evidence ... is to be introduced by the state. Failure to supply such information is a violation of Rule 25.03 and cannot be condoned." *State v. Childers*, 852 S.W.2d 390, 391–92 (Mo.App. E.D.1993). In this regard, we note that Rule 25.03(A)(2) does not, by its terms, provide an exception whereby statements of a defendant need not be disclosed if they are used for impeachment during cross-examination. Here, the State failed to disclose Defendant's job application in violation of Rule 25.03(A)(2), and the trial court erred when it found that the State did not commit a discovery violation.

■ Once it is determined that the State committed a discovery violation, then we must determine whether the violation resulted in fundamental unfairness or bore a real potential for substantively altering the outcome of the case. *State v. Johnston*, 957 S.W.2d 734, 750 (Mo. banc 1997). Fundamental unfairness occurs in discovery violation cases when the state's failure to disclose results in the defendant's genuine surprise at learning of an unexpected witness or evidence, and the surprise prevents meaningful efforts by the defendant to consider and prepare a strategy for addressing the state's evidence. *Id.* While any incriminating evidence is prejudicial, the notion of fundamental unfairness is to be measured by whether the nondisclosure would have affected the result of the trial. *Petty*, 967 S.W.2d at 138.

■ In this case, Defendant has not shown how the nondisclosure of the job application by the State resulted in genuine surprise and prevented meaningful efforts by him to consider and prepare a strategy for addressing the State's evidence. Evidence that he had been working in Sikeston for Interim Personnel had already been introduced in the State's case-in-chief. Detective Croker testified that Dennis told him that Defendant was in Sikeston during the weekend of the robbery working for Interim Personnel with Bell. Defendant did not object to this portion of the testimony as hearsay, and, therefore, the hearsay was admissible. *See State v. Basile*, 942 S.W.2d 342, 357 (Mo. banc 1997) ("Generally, inadmissible hearsay which comes into the record without objection may be considered by the jury.... In the absence of a timely objection or proper motion to strike, hearsay evidence is admitted."). In light of the fact that there was evidence, which Defendant was aware of, beyond the job application linking Defendant to Sikeston during the time the robbery occurred, he cannot now claim that the nondisclosure of the job application was fundamentally unfair. His first point, therefore, must be denied.

In his second point, Defendant argues that the trial court erred in overruling his motion to dismiss the charges against him based on pre-indictment delay. Defendant contends that the delay resulted in his alibi witnesses no longer being able to remember whether he spent the night of the robbery and shooting with Tarquesha Hodges ("Hodges"). He also argues that the State delayed the prosecution in order to gain a tactical advantage in that they wanted to make "a better deal" with Hatcher for his testimony against Defendant, "despite Hatcher's proclivity to lie."

Prior to trial, on August 11, 2000, Defendant filed a motion to dismiss the charges due to pre-indictment delay. That motion alleged that the Kellett Oil robbery occurred in June 1998, but that Defendant was not arrested until September 1999.

The motion also alleged that the State had knowledge of Defendant's involvement with the Kellett Oil robbery "from at least September 15, 1998."

In evaluating a claim of pre-indictment delay, an appellate court must determine "not whether th[e] delay should have happened but rather whether th[e] delay justifies the dismissal of charges against the [defendant] under the due process clause of the Fifth and Fourteenth Amendments." *State v. Griffin*, 848 S.W.2d 464, 467 (Mo. banc 1993). The test for determining whether pre-indictment delay requires the dismissal of charges is whether "1) the defendant was prejudiced by a pre-indictment delay which 2) was intended by the prosecution to gain a tactical advantage over the defendant." *Id.* A defendant must demonstrate both elements of this test, as any due process inquiry must consider the reasons for the delay as well as the prejudice to the accused. *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752, 759 (1977).

In the instant case, Defendant has failed to demonstrate that the delay in filing the information impaired his ability to present a defense, and that he was therefore prejudiced. *See State v. Clark*, 859 S.W.2d 782, 786 (Mo.App. E.D.1993). He alleges that his "family members reasonably began to forget the events of June, 1998." However, Defendant must do more than assert that his witnesses' memories began to dim due to the delay. "The prejudice shown must be more than the 'real possibility of prejudice inherent in any extended delay; that memories will dim, witnesses will become inaccessible, and evidence will be lost.' " *Id.* (quoting *United States v. Marion*, 404 U.S. 307, 326, 92 S.Ct. 455, 466, 30 L.Ed.2d 468, 482 (1971)). He must indicate the nature of possible evidence that could be adduced. *See Clark*, 859 S.W.2d at 786.

Contrary to Defendant's assertion that his alibi witnesses could no longer remember the critical night, his witnesses were not only able to remember the events of June 4–6, 1998, but they remembered specific details of those days. For instance, Defendant's mother, Ruth Dennis, testified that on Thursday, June 4, 1998, she, her husband, their daughter, and Defendant drove to Barnes Hospital in St. Louis, left the hospital about 4 p.m., and returned to Malden at approximately 9 or 10 p.m. She testified that Defendant then went to Hodges' house that night. She also testified that on June 5, Defendant went to the drugstore to have a prescription filled for his father, but the pharmacist would not fill it. She stated that Defendant stopped by their home later in the evening with his friend, Antonio Porter, and that she could hear his car music and told Defendant to turn it down. She testified that he left after getting some tapes from their home, and she did not see him again until the next morning when they went to the mall together.

Defendant has not shown that he suffered prejudice to the extent that his constitutional due process rights were infringed because of the State's delay in filing the information. Because he has failed to demonstrate that he was prejudiced, we need not reach the second prong of the test for prejudicial delay. *See State v. Williams*, 740 S.W.2d 345, 347 (Mo.App. E.D.1987). Defendant's second point is denied.

In his final point, Defendant contends that the trial court abused its discretion in denying his motion to sever his trial from the trial of his co-defendant, Bell. He argues that the probability for prejudice existed in a joint trial, and severance was necessary to achieve a fair determination of his guilt or innocence. Specifically, Defendant contends that the fact that Bell had previously pled guilty to two counts of

possession of a controlled substance made it more likely for Bell to be convicted of the Kellett Oil crimes and for Defendant to be convicted "simply because he was [Bell's] cousin and [was] tried together with him."

Joint trials play a vital role in the criminal justice system as they further the interests of justice by avoiding inconsistent verdicts and lead to more accurate assessments of relative culpability. *State v. Merrill*, 990 S.W.2d 166, 174 (Mo.App. W.D.1999). For these reasons, courts traditionally favor joint trials. *Id.* Courts will only grant motions to sever where there is a serious risk of compromising the defendant's rights or the jury's ability to make a fair judgment. *Id.* The issue of whether to sever a joint trial lies within the trial court's discretion, and appellate courts will not disturb the decision absent an abuse of discretion. *State v. Kidd*, 990 S.W.2d 175, 182 (Mo.App. W.D.1999). The defendant must affirmatively show that the joint trial prejudiced his rights. *Id.*

Here, Defendant alleges that "[t]here was no evidence against [him] other than the testimony of the snitch, [Hatcher]. . . . However, [Bell] had other evidence which hurt him: he had prior convictions." Defendant further states in his brief that "[t]he jury recognized this distinction between the two: they recommended a fifteen year sentence for [Bell] and a ten year sentence for [Defendant]. Yet who is to say that they did not *convict* [Defendant] only because he was tried jointly with [Bell]? . . . Had he been tried separately, the jury may very well have acquitted him."

Defendant has not affirmatively shown that the joint trial prejudiced his rights, and raises only speculative claims that the jury may have acquitted him if he was tried separately. The jury was instructed that they could only use Bell's prior convictions in determining his credibility and the weight to be given to his testimony. The jurors were also instructed that they could consider evidence of Defendant's good character "along with all of the other evidence in the case in determining the guilt or innocence of [Defendant]." Given that juries are presumed to follow the trial court's instructions and that Defendant has not made any factual showing of prejudice, Defendant's argument that severance was necessary to achieve a fair determination of his guilt must fail. *See Kidd*, 990 S.W.2d at 185. Defendant's third point is denied.

The judgment of the trial court is affirmed.

PARRISH, J., and RAHMEYER, J., concur.