**Brett L. JOHNSON, Appellant,**

v.

**STATE of Missouri, Respondent.**

No. WD 71057.

Missouri Court of Appeals, Western District.

Dec. 7, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2011.

Susan L. Hogan, Kansas City, MO, for appellant.

Shaun J. Mackelprang and Karen L. Kramer, Jefferson City, MO, for respondent.

Before Division One: JAMES M. SMART, JR., P.J., MARK PFEIFFER, and CYNTHIA L. MARTIN, JJ.

PER CURIAM:

Brett L. Johnson appeals the denial of his Rule 29.15 motion for post-conviction relief following an evidentiary hearing in which he sought to vacate his convictions for first-degree murder and armed criminal action. He contends that the motion court clearly erred in denying his claims of ineffective assistance of trial and appellate counsel. The judgment is affirmed.

## Background

The State charged Brett Johnson with first-degree murder, section 565.020,[1] and armed criminal action, section 571.015, for his part in the stabbing death of sixteen-year-old Jimmy Weber. The cause went to trial before a jury, and the following evidence was presented.

In the fall of 1999, Johnson and some friends were planning an armed robbery of a local grocery store. They asked their friend Jimmy Weber to drive the "getaway" car, but he declined. At some point, Weber told the group that he had thrown away the stolen shotgun that they

---

1. Statutory references are to the Revised Statutes of Missouri 2000 unless otherwise noted.

planned to use in the robbery.[2] Johnson and his co-conspirator, James Boyd, were angry about this and grew concerned that Weber would tell the police about the planned robbery. The two devised a plan to lure Weber into the woods and kill him.

On Saturday night, September 25, 1999, Johnson and Boyd were riding around with two other friends, Lindsay Harper and Adam Lile, in Lile's vehicle. They drove to Searcy Creek Parkway, and Johnson told Lile to pull over. Johnson and Boyd got out of the car and walked to a spot near where the group would later rendezvous and flee the murder scene. At Johnson's suggestion, Lile then drove the group to Weber's home, and Weber joined them. They drove to a wooded area near some townhouses where Johnson had lived as a child. Johnson suggested that they all go into the woods where he often had played. Harper and Weber were reluctant but eventually agreed. Johnson led the group into the woods. Boyd, Lile, and Weber stopped near the top of a hill, but Johnson kept walking. Harper also stopped, unsure of what to do. Johnson told her to come with him, and she followed him.

Johnson and Harper stopped when they reached a clearing. Harper then heard Weber pleading for his life and crying. She asked Johnson what was happening, and Johnson said, "You know Jimmy's not coming out of the woods tonight." Lile saw Boyd pull a knife out from the waist of his pants and begin stabbing Weber. Boyd stabbed Weber a total of twenty-eight times in the neck, chest, abdomen, back, and arms while Weber pleaded for his life.

Boyd and Lile then joined Johnson and Harper in the clearing, and Boyd said, "It's done. Let's go." Johnson asked Boyd, "What happened?" and Boyd said, "Jimmy's going to go the other way. Let's go." Boyd and Johnson disagreed about which direction to go. At Johnson's insistence, they walked back the same way they had come "to avoid leaving a trail." As they walked past Weber lying on the ground, Harper heard Johnson say, "there's our boy," and Lile heard Johnson ask if anyone wanted a new pair of shoes. Weber then gasped, and the group ran from the scene. When they stopped, Johnson said he would go get the car. The group waited for Johnson atop a hill near Searcy Creek Parkway (a different spot from where they had entered the woods). Johnson drove around to that location and picked them up. As they drove off, Johnson told the group that they needed alibis. He told Harper and Lile what their alibis should be.

The next day, another acquaintance, Aaron Clary, stopped by Johnson's house. Boyd was there with Johnson. Boyd and Johnson had shared a duplex with Clary earlier that summer. When Clary asked about Weber, Johnson told him Weber was "underground." Clary did not know what that meant. At Johnson's request, Clary agreed to let Boyd stay with him that night.

On the way to Clary's residence, Boyd told Clary that he had killed Jimmy Weber and left his body in the woods. Boyd said he and Johnson planned the murder; Lile was there to prevent Weber from running and Harper was there to make Weber feel comfortable about going into the woods with them. Boyd told Clary that he and Johnson's brother, Branden, had tried unsuccessfully to bury the body. He asked Clary to help him bury the body. Clary told Boyd he did not believe his story. The next day, Monday, Boyd led Clary

---

**2.** A shotgun was found at Weber's home after his murder.

into the woods and showed him Weber's body.

When Clary was able to extricate himself from Boyd, he went to see his attorney. Clary told his attorney what he had seen, and the attorney called the Clay County prosecutor. Clary's attorney arranged for the prosecutor and the county sheriff to meet Clary at the attorney's office. From there, Clary led the authorities to the woods, where they found Jimmy Weber's dead body. Near the body, officers found a shallow square-shaped depression in the ground that recently had been dug. They also found a shovel and a knife close by. Johnson, Boyd, and the others involved in the crime were arrested that evening.

Kansas City police officers arrested Lindsay Harper at college in Warrensburg. They brought her back to the police department in Kansas City, where she told them what had happened. She said she did not have any prior knowledge that the murder was going to happen. She gave a videotaped statement to police that included her claim that Johnson said: "You know Jimmy's not coming out of the woods tonight." She later gave a second videotaped statement in which she repeated that statement but also added other details about the night of the murder.

Police also arrested Johnson that Monday evening. After waiving his *Miranda* rights, Johnson gave the police three different stories. In his first two versions, he denied having any prior knowledge that Weber was going to be killed. Johnson gave a third story after an officer told him his second story was not credible in light of others' statements. This time, Johnson said he and his friends became concerned that Weber was going to tell the police about their robbery plans. Johnson said they decided to kill Weber so he could not tell anyone, and they planned the roles everyone would play when they took Weber into the woods: Boyd was to stab Weber, Lile was to block Weber's exit, and Johnson was to take Harper away so she could not see what was happening. Johnson declined to make a videotaped statement.

At trial, Lile, Harper, Clary, and the detective who interviewed Johnson testified consistent with the foregoing recitation of facts. The parties agreed to play Harper's two videotaped statements for the jury and to provide transcripts of the recordings.

Johnson also testified. He said Boyd stabbed Weber while Johnson and Harper were hiking ahead of the others. He said Boyd never told him why he did it. Johnson said that the second time he heard Weber crying out, he said, "Oh my God, Jimmy might not leave the woods." Johnson acknowledged that he had "thumbed through" some books belonging to Boyd about how to commit murder. Johnson said it was Boyd who first suggested that they come up with alibis. Johnson also called his brother, Branden, to testify. Branden said that Boyd showed him Weber's body and where the knife was hidden. He said Boyd asked him to help bury the body but he refused.

The State then called Johnson's ex-girlfriend to rebut his testimony that he did not take Boyd's threats to harm people seriously. She stated that Boyd did what Johnson told him to do. She said Johnson once threatened that if she did not shut her mouth, Boyd would "take a bath in her blood," at which point, Boyd licked his knife. She also told the jury that Johnson and Boyd talked about forming their own mafia, or "gang type thing."

The State also called Randall Sanford as an additional rebuttal witness. Sanford had shared a jail cell with Johnson. Ac-

cording to Sanford, he and Johnson had discussed Johnson's charges and the facts of the case. Sanford testified, *inter alia*, that Johnson had admitted to him that while Johnson was in the woods (at the time of the scream by Jimmy Weber coming a distance away in the woods), that Johnson did not say, "Oh my God, Jimmy might not leave the woods." Sanford testified that Johnson admitted to him that Johnson actually said, at that time, something more similar to what Harper had testified he said: "You know Jimmy's not coming out of the woods tonight." He also said that Johnson claimed to be the leader of the group that night, rather than Boyd, and admitted that they did it because they were afraid Weber would tell police about the robbery plan. Johnson objected to Sanford's testimony on grounds that the State had not informed the defense about Sanford or about any statements Johnson allegedly had made to him. The court, after allowing Johnson's attorney an opportunity for a brief interview with Sanford, and after requiring the prosecution to provide the defense with Sanford's criminal record, overruled Johnson's objection based on surprise, and allowed Sanford's testimony.

While in deliberation, the jury asked to see the transcripts of Harper's two statements, and the parties agreed to provide them. Ultimately, the jury found Johnson guilty of first-degree murder and armed criminal action, and the court sentenced him to concurrent terms of life without the possibility of parole and twenty-five years. Johnson appealed, and this court affirmed in a *per curiam* opinion, *State v. Johnson*, 135 S.W.3d 535 (Mo.App.2004).

Johnson filed a timely motion for post-conviction relief. He raised claims of ineffective assistance of both trial and appellate counsel. Johnson's trial counsel and appellate attorney both testified at the evidentiary hearing. Johnson did not. The court denied the motion, and Johnson now appeals.

## Standard of Review

■ Appellate review of a Rule 29.15 decision is limited to determining whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k). Findings and conclusions are deemed clearly erroneous only if, after reviewing the entire record, the appellate court is left with the definite and firm impression that a mistake has been made. *Middleton v. State*, 103 S.W.3d 726, 733 (Mo. banc 2003).

## Ineffective Assistance of Trial Counsel

Johnson's first two points relate to his claims of trial counsel ineffectiveness. A movant must prove a claim of ineffective assistance of counsel by a preponderance of the evidence. Rule 29.15(i). He first must show that counsel's performance was deficient, in that it "did not conform to the degree of skill, care, and diligence of a reasonably competent attorney" under similar circumstances. *State v. Hall*, 982 S.W.2d 675, 680 (Mo. banc 1998) (*citing Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). The movant must overcome the strong presumption that counsel *was* competent and that any challenged action was a part of a sound trial strategy. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *Middleton*, 103 S.W.3d at 732. Second, the movant must show that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. To demonstrate prejudice, the movant must show a reasonable probability that the outcome of the trial would have been different absent the claimed errors. *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a

probability sufficient to undermine confidence in the outcome." *Id.*

### Evidence of Violently Themed Books

Johnson says the motion court erred in denying his claim that his trial counsel was ineffective for failing to object when the State introduced evidence of Boyd's violently-themed books, for bringing out on direct-examination that Johnson had "leafed through" those books, and for failing to object when the State cross-examined Johnson about reading the books.

At trial, defense counsel first alluded to violently themed books in his opening statement. After characterizing Jim Boyd as a "blow-hard" who collected knives and talked about "videotapes that taught how to kill and bomb," counsel said: "You will hear that [Boyd] read books about military things and talked about the CIA and those sorts of things."

Later, the State elicited testimony from Aaron Clary that Boyd owned books entitled *Kill Without Joy, the Complete How-to-kill Book; Hit Man, the Manual for Independent Contractors;* and *Effective Techniques for Unarmed Combat* when they lived at the duplex and that he had seen Johnson reading them. Defense counsel did not object. On cross-examination, Clary said everyone in the group had read them, including Adam Lile and Jimmy Weber.

When Johnson took the stand, his attorney asked him about the books. Johnson said he had "leafed through" them when he, Boyd, and Clary lived together at the duplex. On cross-examination, the State asked Johnson about each specific book. Johnson said he had "thumbed through" and "read through" some of the books but did not recall their specifics. When the prosecutor attempted to refresh his memory by reading an inflammatory passage from *Hit Man* aloud, defense counsel objected stating that Johnson said he did not remember the books' specifics. The court sustained the objection. The State then asked Johnson if he had read the "lesson on knifework" in *Kill Without Joy.* Johnson said he did not recall reading specifics from the book or remember pictures about stabbing someone. When the prosecutor asked if a particular picture was remarkably similar to how the victim had been stabbed, defense counsel again objected, and the court sustained. Later, the prosecutor asked Johnson if he would use Boyd, "the guy that read the book *Hit Man,*" as a hit man. Johnson said he would not, because no one took Boyd seriously when he read such books or talked about such things.

■ In his 29.15 motion, Johnson claimed that defense counsel was ineffective in handling this issue. Trial counsel testified that the defense strategy was to show that Boyd alone was responsible for the murder. He said the books "absolutely fit into our defense that my client was not the violent person, that Jim Boyd was in fact the violent person, and not only was he a violent person, he had violent literature in the house." Counsel believed that the books would come into evidence regardless of whether he objected, and he wanted to present them in the best possible light; he did not want to look like he was trying to hide them from the jury.

In denying this claim, the motion court found that it was defense counsel's trial strategy not to object to mention of the books and to question Johnson about them on direct examination to support his theory of the case. The motion court found that the trial record supported the belief that the books would have been admitted over any objection made by defense counsel, noting Clary's testimony that he had seen Johnson reading the books. Because

counsel's actions were the result of trial strategy, the motion court found no basis for post-conviction relief.

The motion court did not err in so finding. The transcript from the criminal trial and the record of the evidentiary hearing both show that counsel's failure to object to the book evidence and decision to question Johnson about it was based on trial strategy. Counsel sought to connect the books to Boyd and to argue that he was the violent person who committed the murder without anyone else's prior knowledge. Moreover, counsel did object when the State went too far in trying to connect the books to Johnson, and the objections were sustained.

 "Ineffective assistance of counsel is rarely found in cases of a failure to object." *Williams v. State,* 205 S.W.3d 300, 305 (Mo.App.2006). Failure to object does not constitute ineffective assistance "unless admission of the objectionable evidence resulted in a substantial deprivation of movant's right to a fair trial." *Harrison v. State,* 301 S.W.3d 534, 538–39 (Mo. App.2009). "If a failure to object ... is based on reasonable trial strategy, then no ineffective assistance of counsel can be shown." *Williams,* 205 S.W.3d at 305. Reasonable choices of trial strategy cannot serve as the basis for an ineffective assistance claim. *Anderson v. State,* 196 S.W.3d 28, 33 (Mo. banc 2006). Counsel is not ineffective for pursuing one reasonable trial strategy to the exclusion of another. *Id.* Johnson does not demonstrate that this strategy was not reasonable.

 In any event, to prevail on this claim, Johnson had to show that an objection would have been upheld if made. *Glass v. State,* 227 S.W.3d 463, 473 (Mo.

banc 2007). He fails to do so. The book evidence was relevant and, thus, admissible, because it showed a source of knowledge for Johnson's and Boyd's scheme to kill Weber. The State's theory was that Johnson and Boyd conspired to kill Weber and that Johnson essentially used Boyd as the "weapon" to do so. Even if Johnson had not read the books, the fact that he knew Boyd had read them supported this theory. Thus, Johnson fails to show that there was a viable objection that could have been made. Counsel is not ineffective for failing to make a non-meritorious objection. *Id.*

Because trial counsel's handling of the book evidence was trial strategy and because the evidence was admissible, the motion court did not err in denying this claim. Point denied.

### *Admission of Lindsay Harper's Statements*

 Johnson also says the motion court erred in denying his claim that trial counsel was ineffective for agreeing to play Lindsay Harper's videotaped statements at trial and providing transcripts for the jurors, and for agreeing to send the transcripts to the jury during deliberations.

Lindsay Harper first gave a videotaped statement when she was arrested on September 28, 1999. She was charged with first-degree murder and armed criminal action at that time. On August 17, 2000, she gave a second videotaped statement in conjunction with her agreement to plead guilty to the lesser charge of abandonment of a corpse.[3]

Harper's two statements contained much of the same information. She said in both, for example, that Johnson told her,

**3.** Though the State had asked for a five-year sentence, the court placed Harper on probation.

"You know Jimmy's not coming out of the woods tonight," and that he instructed the others to come up with alibis. But her second statement also contained additional details that were not in the original. In her second statement, Harper said Johnson initially told her, on the night of the murder, that she "might not want to come over." She also said she overheard Boyd tell Johnson that things were "falling apart" and that the two discussed whether they could "still do this." She revealed that the group had made the initial trip out to Searcy Creek Parkway before going to pick up Jimmy Weber. She also said she was afraid to go into the woods and that Johnson talked her into it. Harper recounted in her second statement that Boyd said, "It's done," after the stabbing and that Johnson said, "There's our boy" as they walked past Weber's body. She also said Johnson asked her after the murder if she could "stand up to interrogation" and that she was afraid of Johnson.

Harper's videotaped statements also differed from her trial testimony in at least one important respect: in both statements, she indicated that Johnson said "Jimmy's not coming out of the woods tonight" *before* she heard Jimmy cry out; at trial, she told the jury that Johnson said it *after* they heard Jimmy's cries.

At trial, defense counsel agreed to admit both videotaped statements and their transcripts. Both videotapes were played and transcripts were temporarily provided to the jurors. In his closing argument, defense counsel told the jury to consider Harper's story and to ask for her videotaped statements. He said:

> Remember the second statement with all the extra stuff in it occurred the day she was allowed—she had to do it before she was allowed to enter her guilty plea. Listen to those two statements. Compare those two statements. See exactly

what was said in there. Look at all the new information that went in as a result of the plea offer in her case, taking it down from life in prison to five years in prison.

During deliberation, the jury *did* ask for Harper's two videotaped statements. The parties agreed to give the jury transcripts of the statements instead.

Johnson claimed in his 29.15 motion that trial counsel was ineffective in agreeing to the admission of this evidence. At the evidentiary hearing, trial counsel explained that there were inconsistencies between Harper's statements and that it "appeared as though the statements had improved once she had a plea offer." Counsel said Harper's later statement made appellant "look more culpable." Counsel explained that he had to be cautious in cross-examining Harper, because she "was a fragile sort of delicate-approach witness" who "had a lot of jury appeal." He thought that showing the videotapes to the jury would allow him to impeach her credibility "in a kind of kid-glove approach." Counsel said his handling of Harper's statements was "absolutely, trial strategy" and that the videotapes "absolutely" helped him attack her credibility. Counsel believed that the videotapes had more impact than simple cross-examination would have had.

The motion court denied this claim, finding that counsel's motivation for playing the videotapes and allowing the jury to review transcripts of the statements during deliberations was trial strategy and did not provide a basis for post-conviction relief.

The motion court did not err. Defense counsel's testimony at the evidentiary hearing, and the trial record itself, made clear that counsel presented both statements to suggest that Harper invented new incriminating evidence against Johnson as part of her plea agreement. John-

son says counsel could have done this via cross-examination, but counsel felt that it would be more effective for the jury to hear and see the actual statements. By actually seeing the transcripts, he thought, the jury could see the details that Harper added prior to her plea.

 Johnson says this strategy was unreasonable because rather than helping impeach Harper's credibility, it had the effect of reinforcing the incriminating evidence that appeared in both statements. We disagree. Neither the fact that the second statement may have reiterated some parts of the first, or even the fact that some aspects of Harper's statements were more incriminating than her trial testimony, renders this strategy unreasonable *per se* or automatically constitutes ineffective assistance of counsel. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson,* 196 S.W.3d at 33. Counsel is not ineffective for pursuing one reasonable strategy to the exclusion of another. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Johnson has not persuaded us that counsel's strategy was unreasonable. As noted in *Strickland,* "There are countless ways to provide effective assistance in any given case." *Id.* "Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

 Even if counsel's actions were deficient, Johnson does not demonstrate that he was prejudiced by them. He testified himself that he said Jimmy Weber would "not leave the woods," and his explanation that it was simply an expression of shock upon hearing Weber's cries was implausible. The normal reaction, upon hearing unexpected screams, would be to express surprise and concern, such as: "What's going on?" or "What was that?" and perhaps even going to see what had happened. Johnson's statement that Jimmy would not leave the woods—regardless of whether it came before or after hearing his cries—indicated that he knew before going into the woods that Boyd intended to kill Jimmy while they were there.

Furthermore, in ruling on Johnson's direct appeal, we found that "the evidence at the crime scene, the testimony of Lindsay Harper and Aaron Clary, and the confession of Johnson overwhelmingly established his guilt beyond a reasonable doubt." *See Johnson,* 135 S.W.3d 535, mem. op. at 6. Johnson fails to establish that he was prejudiced by counsel's perceived deficiencies in light of this overwhelming evidence of guilt.

Because trial counsel's actions were based on reasonable trial strategy and because Johnson is unable to show prejudice, the motion court did not err in denying this claim.

Point denied.

### Ineffective Assistance of Appellate Counsel

In point III, Johnson says the motion court erred in denying his claim that his appellate counsel was ineffective for failing to argue that because the State violated its discovery duty under Rule 25.03 in not disclosing the defendant's statements allegedly made to Randall Sanford, the trial court erred in allowing the State to call Randall Sanford as a rebuttal witness.

Johnson says he was prejudiced by counsel's ineffectiveness, because a reasonable probability exists that the result of the direct appeal would have been different had counsel raised this issue.

■ To prove ineffectiveness of appellate counsel, Johnson had to show that counsel failed to raise a claim of error on appeal that a competent and effective lawyer would have recognized and asserted. *Anderson*, 196 S.W.3d at 36. The movant "must show that the claimed error [was] sufficiently serious to create a reasonable probability that, if it was raised, the outcome of the appeal would have been different." *Id.* "The right to relief [on such a claim] inevitably tracks the plain error rule"; thus, the movant must show that "the error that was not raised on appeal was so substantial as to amount to a manifest injustice or a miscarriage of justice." *Middleton v. State*, 80 S.W.3d 799, 808 (Mo. banc 2002).

After the State and the defense had rested their cases in chief, the State called Sanford. Defense counsel objected on grounds that the State had not listed him as a witness nor provided any discovery about him. The trial court instructed the State to tell the defense who Sanford was and what he was expected to say. The State said that Sanford was Johnson's cellmate and that Johnson had talked to him about the facts of the case. The prosecutor said that "Sanford would not be called as a rebuttal witness if the defendant had not testified, but Mr. Sanford will specifically rebut the specifics of what Brett Johnson said he did not say or did not do from the witness stand." The court directed the State to give the defense a copy of Sanford's criminal record for impeachment purposes. During a recess, the court allowed defense counsel time to speak with Sanford. The court then allowed Sanford's testimony over objection, on the basis that he was a rebuttal witness.

Sanford testified that Johnson told him that he and Boyd had killed Jimmy Weber because they were afraid he would report their robbery plans. He said Johnson told him that Harper and Lile did not know that the murder was going to happen. Sanford said Johnson told him he was going to testify that, *after* hearing Weber scream, he said, "Oh, my God, Jimmy's not coming out of the woods." Sanford also said Johnson claimed to be the leader of the group. Johnson told Sanford that he had told the others they would need alibis but that he was going to testify that Boyd had said it. Sanford also said Johnson admitted that he stole a shotgun from the home of a girl named Diane, which was consistent with evidence presented at trial. Sanford acknowledged that he hoped to receive favorable treatment in his own prosecution as a result of his testimony.[4]

■ Rule 25.03(A)(2) requires the State, upon written request, to disclose to defense counsel "[a]ny written or recorded statements and the substance of any oral statements made by the defendant [and] a list of all witnesses to the making[.]" Johnson alleged that trial counsel failed to identify the rule number and objected only that he had never heard of the witness. The motion court found, as to that claim, that counsel's objection, while not reciting the actual rule number, was sufficient to invoke the rule. We agree.

4. In the midst of Sanford's testimony, he revealed that he had taken written notes with him when he went to meet with the prosecutors. The court ordered the State to produce those notes and give them to the defense. After a lengthy discussion about whether or not the notes had been destroyed (and if so, by whom), the court eventually concluded that they had been destroyed by Sanford's attorney. Sanford continued testifying.

■ Johnson claimed in his 29.15 motion that appellate counsel was ineffective for failing to argue on direct appeal that the State violated Rule 25.03(A)(2) when it failed to disclose Randall Sanford as a witness and Johnson's alleged statements to him. The motion court's denial of that claim is the basis of this point on appeal.

At the evidentiary hearing, trial counsel testified that he had never heard of Sanford until the State called him to testify, had received no discovery regarding him, and had no indication that Sanford had information about statements made by his client. Counsel said the court gave him thirty-five minutes to go to the jail to talk to Sanford before his testimony. Counsel said much of that time was spent waiting for Sanford. Counsel claimed that he did not have enough time to prepare his cross-examination. He pointed out that he objected to Sanford's testimony but that the objection was overruled.

When appellate counsel testified, she acknowledged that she did not raise any claim of error in letting Randall Sanford testify or any argument that Rule 25.03(A)(2) was violated. She said that she "just missed it." She now is more familiar with the part of Rule 25.03 that requires the State to divulge oral or written statements, she said.

The motion court denied Johnson's claim. The court found that he failed to show that the claim he says appellate counsel should have raised would have required reversal had it been asserted. The court pointed to the fact that Sanford's testimony "was offered to rebut inconsistencies in [Johnson's] testimony" and observed that the subject matter of Sanford's testimony already had been offered through Aaron Clary, Lindsay Harper, and the police detective to whom Johnson had confessed.[5]

Johnson says this was error. He says that a reasonably competent appellate attorney would have argued on appeal that the State violated Rule 25.03(A)(2) and that the trial court erred in allowing the State to call Sanford to testify. Had appellate counsel raised this issue, he argues, this court would have been compelled to grant a new trial. He cites *State v. Willis*, 2 S.W.3d 801 (Mo.App.1999), and *State v. Gonzalez*, 899 S.W.2d 936 (Mo.App.1995), two cases in which convictions were reversed on appeal after the State introduced incriminating statements the defendant had made to others without first disclosing the existence of those statements to defense counsel.

In *State v. Willis*, 2 S.W.3d 801, 802 (Mo.App.1999), the defendant was charged with involuntary manslaughter in the death of his baby daughter. At a pre-trial hearing on the day the trial started, the prosecutor referred to two letters Willis had written to his wife from jail that contradicted his planned defense. *Id.* at 803. The court allowed the letters for purposes

---

5. Neither party has purported to delineate precisely how much of Sanford's testimony could properly be called rebuttal and how much was simply consistent with other prosecution testimony. We believe Sanford's testimony did include what could properly be considered rebuttal, at least to the extent that it dealt with what Johnson stated in the woods at the time of the scream and to the extent that it dealt with Johnson's leadership of the group that night. It is important to recognize that the mere fact that evidence as to an admission of the defendant does not make it rebuttal merely because the defendant chooses to testify. *See, e.g., State v. Kehner*, 776 S.W.2d 396, 398–99 (Mo.App.1989). At the time the testimony was presented, defense counsel did not clearly articulate an objection related specifically to the extent that the testimony of Sanford might have exceeded actual rebuttal. In any event, of course, we agree with the appellant that, rebuttal or not, such testimony is required to be disclosed in discovery pursuant to Rule 25.03.

of the hearing. *Id.* The next morning, defense counsel objected to the State's use of the letters during trial, claiming that the State's failure to timely disclose the letters violated discovery rules. *Id.* The State justified its failure to disclose by claiming that it did not intend to use the letters unless Willis testified. *Id.* The trial court found that the State had not complied with Rule 25.03(A)(2) but that Willis was not prejudiced. *Id.* The trial court allowed the letters to be used at trial, and the State used the letters as a significant part of its cross-examination of Willis. *Id.* Willis argued on appeal that the State's failure to timely disclose the two letters until the morning of trial violated Rule 25.03(A)(2), "disabled the defense to which he was already committed," and "affected the verdict." *Id.* He claimed that the trial court abused its discretion in permitting the State to use the letters. *Id.* The appellate court noted that it will reverse if the defendant demonstrates that the State's failure to timely disclose "results in fundamental unfairness." *Id.* The appellate court concluded that the State's failure to disclose the letters was a violation of Rule 25.03(A)(2) and did result in fundamental unfairness in that it prevented the defendant from having all the information necessary to prepare his defense for trial. *Id.* at 806–07. The court rejected the State's various arguments regarding a lack of prejudice, and reversed and remanded for a new trial. *Id.* at 808–09.

In *State v. Gonzalez*, 899 S.W.2d 936 (Mo.App.1995), the defendant was on trial for second-degree murder and armed criminal action. The court allowed the State to cross-examine Gonzalez about an admission he purportedly had made to a fellow inmate, despite defense counsel's objection that no such statement had been disclosed to him prior to trial. *Id.* at 937. Gonzalez was convicted on both counts. *Id.* at 936. On appeal, he argued that the trial court erred in allowing the State to question him about the undisclosed statement. *Id.* at 937. In response to the State's argument that Gonzalez did not show how timely disclosure would have helped him, the appellate court pointed out that counsel "would at least not have been surprised by the questions" and "would have been equipped to repair any damage done, or perceived to have been done, by the prosecutor's questions." *Id.* at 938. The court concluded that the prosecutor's failure to disclose the alleged statement *combined with* an improper jury argument to prejudice the defendant and warranted reversal and a new trial. *Id.*

Johnson says the State's discovery violation prevented him from making an informed and voluntary decision about whether to testify at trial and also deprived him of an opportunity to investigate Sanford's claims, prepare to cross-examine him, or locate witnesses who could have refuted his claims. Johnson says he was prejudiced because this court would have reversed his convictions if the discovery violation had been raised on direct appeal. Johnson's evidence at the evidentiary hearing, while demonstrating surprise, did not, however, demonstrate that Johnson's defense was altered in any way. The evidentiary hearing was the proper time to present testimony showing that the discovery violation created not only surprise, but fundamental unfairness.

The State, while conceding that the prosecutor's failure to disclose Johnson's statements to Sanford was a discovery violation, says that this does not automatically mean the claim requires reversal. The State argues that Johnson fails to establish that the violation resulted in "fundamental unfairness." The State says that "[a]ppellate courts will intervene [in such a case] only where a defendant shows that the failure to make a timely disclosure result-

ed in fundamental unfairness." *State v. Jamison,* 163 S.W.3d 552, 557 (Mo.App. 2005). "Fundamental unfairness," says the State, "turns on whether there was a reasonable likelihood that an earlier disclosure ... would have affected the result of the trial." *Id.* "Fundamental unfairness occurs when the State's failure to disclose results in defendant's 'genuine surprise' and the surprise prevents meaningful efforts to consider and prepare a strategy for addressing the evidence." *State v. Thompson,* 985 S.W.2d 779, 785 (Mo. banc 1999).

In *Thompson,* the Supreme Court addressed allegations of discovery violations by the State in the guilt phase of a capital murder case. *Id.* at 784. The defendant there failed to identify any specific ruling of the trial court as to the discovery issues in question. *Id.* The Court also noted that the defendant did not specify, either on appeal or before the trial court, how further investigation or preparation would have benefited his defense. *Id.* at 785. The Court concluded that the "[d]efendant's bare assertions of prejudice are not sufficient to establish fundamental unfairness nor do they demonstrate how the outcome of the case was substantively altered." *Id.*

The Court in *Thompson,* however, also addressed allegations of discovery violations in connection with the *penalty* phase of the case. In appellant's point I as to the *penalty* phase, the defendant contended that he was caught by surprise when his former wife testified that the defendant, in a previous incident, had "shot someone he had seen 'messing with his car.'" *Id.* at 792. The State admitted that it failed to disclose to the defendant that it intended to introduce evidence about the incident. *Id.* Although the defendant objected on grounds of non-discovery immediately after the ex-wife's testi-

mony concluded, the defendant had failed to object contemporaneously with the ex-wife's testimony about the incident. *Id.* Review, therefore, was for plain error pursuant to Rule 30.20. *Id.*

Because of the significance of the testimony (which defendant was not prepared to rebut) about an act of violence with a deadly weapon that was also an act of "unreasonable territoriality," and because of "the totality of the circumstances" (which included the fact that this was the sentencing phase of a capital case in which a death penalty had been imposed), the court found a manifest injustice or miscarriage of justice. *Id.* Without specifying exactly how the non-disclosure presumably affected the defense's strategy or otherwise affected the fairness of the proceeding, the Court reversed the death sentence and remanded for a new sentencing hearing. *Id.*

This case does not involve the penalty phase of a capital case, as in *Thompson.* Nor does it involve a case in which there were (presumably) no eyewitnesses as to any of the circumstances of death (the death of an infant child), as in *Willis.* Nor was the non-disclosure here combined with the prejudicial effect of an improper jury argument, as was the case in *Gonzalez.* As far as the ruling in *Thompson* related to the guilt phase discovery violations, the Court seems to indicate that the defendant-appellant must be able not only to articulate the specific discovery violation but also to indicate how the violation prejudiced the defendant's defense. *See Thompson,* 985 S.W.2d at 785.

The evidence of Johnson's knowing and active participation in the murder was strong even without Sanford's testimony, and Johnson does not articulate exactly what the defense would have done differently had it known about Sanford. It is true that Johnson's attorney had very little

practical opportunity, once receiving notice, to develop a strategy to address the testimony.[6] But the question is whether the motion court should have believed that, had appellate counsel selected the non-disclosure of Sanford as a point to argue, there is a reasonable probability that counsel would have been able to obtain a reversal of the conviction.

Johnson argues that "the state's failure to disclose result[ed] in defendant's 'genuine surprise' and the surprise prevent[ed] meaningful efforts to consider and prepare a strategy for addressing the evidence." *See id.* at 785. We suppose that, advance notice of Sanford or not, the defense would have done at least what was done here: attacking Sanford's testimony by showing his own criminal history and his hope for favorable treatment from the prosecution.

This is a post-conviction motion case. We are not now reviewing the actions of the trial judge in this case, other than to judge whether *this court* would likely have reversed the trial court if the discovery violations had been effectively raised and argued in the direct appeal. As to that issue, we can say that a reversal would not have been outside the realm of possibility if counsel had been able to persuade this court that the discovery violation regarding Sanford was in bad faith and if this court had believed, in view of all the circumstances, that the failure to provide notice of Sanford's evidence created a fundamental unfairness. But we cannot say, on this record, that a reversal of the conviction on the direct appeal would have been reasonably probable. *See, e.g., Anderson,* 196 S.W.3d at 36. Nor can we say that the record shows clearly that the discovery violation created fundamental unfairness in some other way to such a degree that this court would have been reasonably likely to reverse the conviction.

It is difficult to establish fundamental unfairness or to demonstrate how the case's outcome was substantively altered by the failure to disclose where there is overwhelming evidence of guilt, because that factor is part of what the court must consider. *See Jamison,* 163 S.W.3d at 557. Here, there was overwhelming evidence of Johnson's guilt. That evidence included his own statements at the time of the murder, which showed his prior knowledge of the plan to kill Jimmy Weber; his remarks about the victim's body, which were inconsistent with those that would be expected from an innocent bystander; his confession to the police; and the testimony of Harper, Lile, Clary, and the interrogating detective. The impropriety of the non-disclosed rebuttal evidence was not highly evident to the trial judge at the time nor to the appointed appellate defense counsel assigned to the appeal.[7] Neither client nor counsel testified at the post-conviction hearing as to how the non-disclosed testimony frustrated the defense strategy or would have affected it if counsel had received proper notice.

---

6. Neither of the parties chooses to discuss how Johnson's strategic maneuvers might have been affected by the fact that Johnson had undergone two previous trials before this trial, and we lack knowledge of the details ourselves. The motion court also did not address the matter. We are left with the assumption that neither party saw any constraints (based on any testimony Johnson may have given at prior trials) as particularly relevant.

7. The only testimony at all in regard to prejudice was the belated speculative opinion of appellate defense counsel that, in light of the fact that there was a hung jury in previous trials, perhaps a trial court ruling excluding Sanford's testimony *altogether* could have resulted in a defense verdict. There was no testimony as to how the non-disclosure of Sanford would have affected the strategy of the defense.

For all these reasons, we cannot say that the motion court "clearly erred" in denying Johnson's motion. The point is denied.

## Conclusion

Based on the foregoing, the judgment is affirmed.