**Sean Lee SYKES, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 73556.**

Missouri Court of Appeals,
Western District.

April 17, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 29, 2012.

Application for Transfer
Denied Aug. 14, 2012.

34

Frederick Ernst, Kansas City, MO, for Appellant.

Richard Starnes, Jefferson City, MO, for Respondent.

Before JAMES EDWARD WELSH, P.J., CYNTHIA L. MARTIN, J., and ZEL FISCHER, Sp. J.

JAMES EDWARD WELSH, Presiding Judge.

Sean Lee Sykes appeals the circuit court's judgment denying his Rule 29.15 motion for post-conviction relief after an evidentiary hearing. A jury found Sykes guilty of the class B felony of recklessly exposing another to human immunodeficiency virus (HIV) infection without that person's knowledge or consent in violation of section 191.677.1(2), RSMo Cum.Supp. 2011. The circuit court sentenced Sykes as a prior and persistent offender to a term of life imprisonment, and this court affirmed the conviction and sentence. *State v. Sykes*, 275 S.W.3d 832 (Mo.App. 2009). In his post-conviction appeal, Sykes asserts that the circuit court clearly erred in denying his post-conviction motion because his appellate counsel was ineffective for failing to raise claims on direct appeal that the circuit court erred in admitting evidence and permitting argument that Sykes had prior convictions for exposing other women to HIV. We disagree and affirm the circuit court's judgment.

As recounted by this court's memorandum on direct appeal, the evidence at trial established that Sykes and D.M.[1] began a sexual relationship shortly after they met in December 2003. At the time, Sykes knew he was infected with HIV. In February 2004, D.M. took an HIV test after her employer told her that Sykes was HIV positive. D.M.'s test results were negative. In August 2004, an acquaintance of

D.M. again told her that Sykes was HIV positive. D.M. confronted Sykes, who denied having HIV. The relationship continued, and, in early 2005, Sykes's sister confirmed to D.M. that Sykes was indeed HIV positive. D.M. again confronted Sykes, who this time confessed that he had HIV. Nevertheless, the sexual relationship continued and, in June 2005, D.M. tested positive for HIV.

During this period, Sykes was on parole and was required to inform his parole officer, Josie Johnson, before he entered into a relationship with anyone. In January of 2005, Sykes told Johnson that he was planning to get married. Johnson demanded to meet with D.M. and eventually obtained a letter from D.M. stating that she knew of Sykes's HIV positive status before she had sex with him. D.M. also told her case manager at the Buchanan County Health Department that she had known Sykes was HIV positive since the beginning of their relationship.

After their relationship ended in January of 2006, D.M. recanted her earlier statements that she had known all along of Sykes's HIV status. She wrote a second letter to Johnson, this time indicating that she did not know of Sykes's HIV status during the first year of their relationship.

Sykes was charged with one count of recklessly exposing another to HIV, in violation of section 191.677. At trial, Sykes stipulated that he was at all times aware of his HIV status and of his duty to warn partners of it. Both of the letters written by D.M. were admitted into evidence.

In regard to the evidence and argument concerning Sykes's prior convictions, the record shows that Sykes's trial counsel filed a motion *in limine*[2] to prevent the

1. Although not required by section 566.226, RSMo Cum.Supp.2011, we exercise our discretion and use initials when identifying the victim in this case.

2. In his motion for a new trial, Sykes raised

State from adducing evidence concerning Sykes's prior convictions.[3] The circuit court tentatively ruled that the State could not admit evidence of Sykes's prior convictions unless the defense opened the door to it.

During the State's direct examination of D.M., she testified, without objection, that, early after she and Sykes started their relationship, Sykes told her that he was on parole for "narcotics distribution." When the State asked D.M. if Sykes ever told her what his prior conviction was really for, Sykes objected to the State's question. The State explained that the evidence was relevant to show that Sykes was deceiving D.M. about his HIV status from the beginning of the relationship with the intent of preventing D.M. from knowing about it so that he could enter into a sexual relationship with D.M. The court sustained the objection, stating that, while Sykes's prior conviction "may be" relevant, it did not believe the prior conviction was relevant "at this point."[4]

D.M. continued to testify about Sykes's repeated attempts to deceive her about his HIV status. D.M. said that she asked one of Sykes's former bosses about Sykes's HIV status and that the boss told her to contact Sykes's parole officer. Sykes did not object to this testimony. When Sykes's sister told D.M. that Sykes was HIV positive, D.M. confronted Sykes. This time, Sykes admitted that he was HIV positive. Sykes objected when the State asked D.M. again if Sykes told her what his prior conviction was actually for. The circuit court overruled Sykes's objection finding that the admission was relevant to show Sykes's motive for concealing his HIV status. D.M. then testified that Sykes's prior conviction was for "knowingly infecting another person to HIV."[5]

D.M. subsequently testified that she remained in a relationship with Sykes at that point because she loved him, because she believed that his disclosure meant they could work out their problems, and because she assumed she was already HIV positive at this point. She said that she gave Sykes's parole officer, Josie Johnson, a false letter saying that she had always known about Sykes's HIV status because Sykes told her that his parole would be revoked without it. She also said that she told the Health Department case manager, Penny Magoon, that she had always known about Sykes's HIV status because she wanted to protect Sykes from being reported.

D.M. testified that, after she and Sykes broke up, she "received papers" found online about Sykes's prior court cases and that, after reading those and noting that she "could have been reading about [herself]," she decided to contact police because she thought Sykes was dangerous.[6]

the issue of circuit court error in overruling his motion *in limine* and subsequently overruling objections during trial regarding the references to his prior convictions.

3. According to the State's argument on the motion *in limine,* Sykes had three prior convictions for exposing victims to HIV.

4. Here, we believe the circuit court was speaking of legal relevance. It was probative of Sykes's state of mind, but its probative value had not yet outweighed its prejudice.

5. D.M. also stated that Sykes "served ten years," but that part of the answer was stricken, and the jury was instructed to disregard it. It is here, we believe, the circuit court decided the probative value of the evidence outweighed its prejudicial effect.

6. Sykes objected to D.M.'s testimony about the contents of the papers and her feelings about them. The State told the court that the witness would not get into specifics about the contents, and the court ruled that the witness could testify that she decided to call the police after reading about the previous case. Sykes

D.M. said that she also told Sykes's parole officer and case worker that her previous claims that she knew about Sykes's HIV status from the beginning of their relationship were false.

During cross-examination, Sykes questioned D.M. about the timing of her recantation of her claim of full knowledge of Sykes's HIV status to his parole officer, asking, "You wrote that after you learned that Sean Sykes was leaving you?" D.M. replied, "Sean had been gone a couple of days. I wrote that letter after I realized that Sean Lee Sykes, upon leaving me, would infect other people. Protecting Sean meant taking protection . . . away from other people."

Sykes then repeatedly questioned D.M. about her inconsistent statements to Johnson, Magoon, and Donna Sonner. D.M. admitted that she had lied about knowing about Sykes's HIV status for Sykes's sake, saying "I never wavered, always stood fast behind him. I stood fast behind Sean." Sykes then asked D.M., "And you stayed that way until January of 2006?" D.M. responded, "Until I'm presented with documentation that proved Sean to be other than what he was—yes, I did. When documentation was presented to me, it made me aware of his danger to women in society. Yeah, I changed my mind. Thought maybe it wasn't such a good thing to protect him anymore."

Later, Sykes asked D.M., "Let me recap with you. The reason you decided to quit protecting Sean was when Penny Magoon showed you documents, documents that showed that he had infected another woman and that made you believe that he was a danger to other women?" D.M. replied, "The documents that she showed me set a pattern of behavior. Sean led me to believe that he loved me." D.M. said that she did not object to D.M.'s testimony that she

she decided to quit protecting Sykes when she "saw a pattern of behavior." She testified that, before she had read about Sykes's prior case, she was aware that he had exposed other women to HIV, stating, "[H]ow could I testify to the fact that I knew what he was in prison for and then testify to the fact that's the first time I heard about the other women? I obviously knew of the other women." She stated that she first learned about the other women through Sykes's sister. At the end of the cross-examination, Sykes again emphasized that January 2006 was the first time that D.M. recanted her statements that Sykes told her about his HIV status.

On redirect, D.M. testified without objection that there were two women Sykes exposed to HIV in his prior convictions and that she was alarmed about "the similarities between the way he interacted with his previous victims." At that point, Sykes objected that D.M. was "using the content of a document to answer the question," and the court prevented any further inquiry.

Sonner, a public health nurse who treated Sykes and D.M. starting in April 2005, was asked by the State if she was aware of Sykes's prior convictions when she started treating him. Sonner started to answer, "I knew that from the information that he had given me—," but Sykes objected, stating that, although the fact that he was incarcerated may be relevant to his treatment, the reason for his incarceration was irrelevant. The State said that it had not asked for the reason, and Sykes acknowledged, "I know, we're just getting close and she was starting to answer the question." The State stated that the "relevant issue is that he lied to her about what his prior conviction was about." The court sustained the objection, ruling that any lie believed Sykes was dangerous.

Sykes told Sonner was irrelevant as D.M. was already aware of Sykes's HIV status at that time. The State then asked again whether Sonner became aware of Sykes's prior convictions without objection, and Sonner responded, "Yes."

During cross-examination of Sonner, Sykes asked if he had granted Sonner "complete access" to his prior health records, and Sonner acknowledged that Sykes had executed a release of information. In response to this line of questioning suggesting that Sykes had been "open and honest" regarding his past medical history, the State on redirect examination asked Sonner, "Did [Sykes] lie to you about his prior conviction?" Sykes made a general objection, which was overruled. Sonner testified that Sykes did lie and told her that he was incarcerated for a physical assault.

Case manager Penny Magoon testified that, when she first started counseling D.M., D.M. claimed that Sykes told her about his HIV status when they started their relationship, but Magoon said that D.M.'s body language suggested that she was hiding something. Therefore, Magoon said that she repeatedly questioned D.M. about that over time. Magoon testified, without objection, that she was also Sykes's case manager and that she was aware of Sykes's prior convictions. She testified that, after Sykes and D.M. broke up and Sykes moved out, D.M. told her that Sykes had not told her that he was HIV positive, that she lied to protect him because she loved him, and that she had contacted a detective about Sykes. At that point, Magoon gave D.M. a copy of a document from a court proceeding in Sykes's prior case. On cross-examination, Sykes asked Magoon why she gave D.M. the court document if D.M. already knew about Sykes's prior convictions. Magoon answered, "To show her that she could

look to see what other people had gone through. She was preparing to press charges." Sykes later asked Magoon why she had researched Sykes on the internet, and Magoon replied, "I had never had a client before that had a prior conviction. So out of curiosity I did that." On redirect, Magoon testified, without objection, that she told D.M. that she could find the case information on the internet herself and that she gave D.M. the information even though D.M. already knew about the prior convictions so she could see what those other victims had been through.

Parole officer Josie Johnson testified, without objection, that she supervised individuals that are on court probation and parolees. Johnson testified, without objection, that she had never supervised someone convicted of "infecting other victims" with HIV but that she required any parolee to report personal information about anybody with whom they entered a relationship. In January 2005, Sykes told Johnson that he was going to get married, so Johnson told him that he needed to bring the woman in or provide her information to run a background check. Johnson testified, without objection, that she then met with D.M. and that they talked about Sykes's HIV status. Specifically, Johnson testified that they discussed if D.M. knew why Sykes "was on supervision and [D.M.] said she was fully aware of his condition." Johnson told D.M. that she would need a notarized letter stating that she had full knowledge of Sykes's HIV status. Johnston testified, without objection, that she had D.M. take this "unusual" step because she had never supervised anyone with Sykes's prior offense and that her supervisor advised her to have D.M. provide the letter.

During its closing argument, the State made the following comments about Mr. Sykes's prior convictions:

Very early in that relationship, this defendant lies about his prior conviction, about the fact that he was on parole for infecting other women with HIV. What's he tell her it was for? Selling drugs. No other reason for him to lie about that but to keep from [D.M.] the fact that he was HIV positive. No possible other motive to lie about that.

. . . .

And his sister tells [D.M.] what those prior convictions are for; that they're for infecting other women with HIV, not for selling drugs. [D.M.] first finds out the truth about all the lies and all the manipulation that's been going on for the whole first year of their relationship.

. . . .

Again, manipulation. He knows [D.M.] is in love with him. He knows she wants it to be a real relationship. So when she finally finds out this information that the defendant is HIV positive and he's been exposing her to this for a year and he's been lying about this for a year; that he's lied about the fact that he's infected other women in the past; what does he do? I guess you won't marry me now.

. . . .

January, 2006, the relationship is ending and [D.M.] realizes his true character. She realizes he's a dangerous individual. She knows what his prior convictions are for. She knows he's been manipulating her and she knows he's going to infect others again. And that's when she goes to the police.

. . . .

This is a dangerous man. This is what he did to me. I know he's going to do it again if I don't try to stop him, if I don't come in here and tell the truth about what happened to me, no matter how hard it might be.

. . . .

And they said, Well, you know, he wouldn't have been able to telepathically know that this letter would be required. Of course, he knew. He is on parole for infecting women with HIV. Of course, he knew. The people supervising him, the state board who has him out on parole for this offense of infecting other women with HIV are going to do everything they can to prevent this from happening to another innocent woman who doesn't know.

. . . .

Donna Sooner corroborates [D.M.'s] testimony, too. This lying about his prior convictions, lying about having infected other women with HIV, this wasn't just a lie to [D.M.]. He lied to Donna Sonner about that. He said it was for assault, probation was for selling drugs. He's hiding the truth about his past. He doesn't want people to know I infected other women with HIV, you could be the next one. Of course, he doesn't tell [D.M.] that. He's hiding it from her to get to enter into this relationship with him.

Penny Magoon, you heard Penny Magoon tell you, I never believed [D.M.]. Yes, we talked about it a lot. I kept asking her and I kept asking her because I knew she wasn't telling the truth about it. I knew that he had lied to her. I believe she'd been infected just like the other women had been infected so I kept asking her."

. . . .

Again, this whole letter—who's it to protect. What's it about? It's to make sure he's not doing the same thing he's already on supervision for. Not to protect him, it's to protect other innocent women from being infected by this defendant. They're trying to make sure this doesn't happen when he's out on

parole for infecting other people, but he does it again.

. . . .

After that, the next day [D.M.] writes this letter. And, again, what did Josie tell you? I just wanted to know that she was aware he was positive. The reason he does that is because he knows I need to back this up. I've been in trouble for this three times before, I'm not going to let it happen again.

During Sykes's closing argument, Sykes claimed that D.M. lied about not knowing that Sykes was HIV positive from the beginning of the relationship. Sykes repeatedly argued that D.M.'s earlier statements that she knew Sykes was HIV positive were true. Sykes also argued that D.M.'s motivation for reporting the crime and recanting her earlier statements was not from reading about Sykes's prior convictions but because "she felt jilted" by Sykes's breaking up with her. Sykes also used his prior convictions to argue that he told D.M. about his HIV status at the beginning of the relationship because he knew the consequences of not telling her about it.

At the conclusion of the case, a jury convicted Sykes of the B felony of exposing another person to HIV infection, and the circuit court sentenced Sykes as a prior and persistent offender to life imprisonment. Sykes appealed to this court but did not raise the issue that the circuit court erred in admitting evidence and permitting argument that Sykes had prior convictions for exposing other women to HIV. This court affirmed Sykes's conviction and sentence. *State v. Sykes*, 275 S.W.3d 832 (Mo.App.2009).

Thereafter, Sykes filed a *pro se* Rule 29.15 motion for post-conviction relief, and appointed counsel filed an amended motion on Sykes's behalf. In the amended motion, Sykes alleged that appellate counsel

was ineffective for failing to claim on appeal that the circuit court erred in admitting evidence and permitting argument that Sykes had previously been convicted of knowingly infecting another with HIV. The circuit court held an evidentiary hearing on Sykes's amended post-conviction motion. On January 5, 2011, the circuit court denied Sykes's post-conviction motion. The court concluded that Sykes's appellate counsel's decision to not raise the issue on appeal was reasonable and sound strategy. Further, the court found that the evidence of Sykes's prior convictions was properly admitted to establish Sykes's knowledge of his HIV positive status and to show the absence of any mistake on his part. Sykes appeals.

■ Our review of the denial of a Rule 29.15 motion is limited to determining whether or not the circuit court's findings and conclusions are clearly erroneous. Rule 29.15(k). We presume that the circuit court's findings of fact and conclusions of law are correct. *Edwards v. State*, 200 S.W.3d 500, 509 (Mo. banc 2006), *cert. denied*, 549 U.S. 1255, 127 S.Ct. 1375, 167 L.Ed.2d 164 (2007). " 'Findings and conclusions are clearly erroneous only if a full review of the record definitely and firmly reveals that a mistake was made.' " *Id.* (citation omitted).

■ Our review of a claim of ineffective assistance of appellate counsel is governed by the same standard as that employed regarding claims concerning ineffective assistance of trial counsel. *Tilley v. State*, 202 S.W.3d 726, 735 (Mo. App.2006). Sykes's burden was to establish that his counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances and that his counsel's deficient performance prejudiced him. *Id.*; *Strickland v. Washington*, 466 U.S. 668,

687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, Sykes must overcome the strong presumption that counsel acted professionally and that all decisions were based on sound trial strategy. *Barnes v. State,* 334 S.W.3d 717, 721 (Mo.App.2011). To establish prejudice, Sykes "must show that, but for counsel's poor performance, there is a reasonable probability that the outcome of the court proceeding would have been different." *Id.* (internal quotation marks and citations omitted). If Sykes fails to satisfy either prong of the test, the court need not consider the other. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. Moreover, as this court explained in *Johnson v. State,* 330 S.W.3d 132, 142 (Mo.App.2010) (citations omitted):

> To prove ineffectiveness of appellate counsel, [the movant has] to show that counsel failed to raise a claim of error on appeal that a competent and effective lawyer would have recognized and asserted. The movant "must show that the claimed error [was] sufficiently serious to create a reasonable probability that, if it was raised, the outcome of the appeal would have been different." "The right to relief [on such a claim] inevitably tracks the plain error rule"; thus, the movant must show that "the error that was not raised on appeal was so substantial as to amount to a manifest injustice or a miscarriage of justice."

At the evidentiary hearing, Sykes's appellate counsel testified that she raised two issues on appeal but that she did not raise the issue concerning admissibility of Sykes's prior convictions. Counsel said that she recognized the potential issue and believed that the issue was preserved for appeal, but she said that she chose not to raise it because she believed it would not be a "particularly strong" issue. Counsel said that she believed the evidence was admissible under an exception to the rule regarding evidence of other crimes, such as intent or absence of mistake. Counsel testified that she did not raise the issue because she wanted to focus on the issues that had more merit and that the evidence of other crimes evidence did not "seem like the strongest issue at the time."

The circuit court denied Sykes's claim, concluding that appellate counsel's strategic decision to forego raising the claim due to her belief that the evidence was admissible was "reasonable and sound." The court also concluded that the evidence was admissible, so raising the issue on appeal would not have changed the outcome on appeal.

■■■ The circuit court did not clearly err in concluding that appellate counsel's decision not to raise the evidence of other crimes issue was "reasonable and sound" strategy. Indeed, "[a]ppellate counsel is not ineffective for failing to raise every non-frivolous claim on appeal but may use his professional judgment to focus on the most important issues." *Barnes,* 334 S.W.3d at 723 (citing *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). "Appellate counsel need not raise every non-frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Morales v. State,* 323 S.W.3d 466, 471 (Mo.App.2010) (citing *Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)). At the evidentiary hearing, appellate counsel testified that, although she recognized the potential issue concerning evidence of other crimes and believed that the issue was preserved for appeal, she chose not to raise it because she believed it would not be a "particularly strong" issue. She just strategically "decide[d] to winnow out arguments in favor of other arguments." *Bullock v. State,* 238

S.W.3d 710, 717 (Mo.App.2007). Even if the claim regarding evidence of other crimes had some arguable merit, counsel was free to rely on her belief that the claims were not strong and instead raise other claims she believed were more meritorious. *Storey v. State*, 175 S.W.3d 116, 149 (Mo. banc 2005).

■ Sykes argues that counsel's strategy was unreasonable because the claims she raised on appeal were ultimately unsuccessful, but this is not the measure of reasonable strategy. Counsel's performance is not judged under the "distorting effects of hindsight" but is evaluated from counsel's perspective at the time. *Johnson*, 330 S.W.3d at 141. At the time, counsel reasonably believed there were two other claims that were stronger than claims regarding Sykes's prior convictions. Thus, counsel's choice not to raise such claims was not unreasonable, and Sykes, therefore, failed to prove that appellate counsel was ineffective.

■ Moreover, appellate counsel was not ineffective for failing to raise a claim regarding evidence of Sykes's prior convictions because that evidence was admissible under the facts and circumstances of this case. Evidence of prior bad acts, while generally inadmissible to show a propensity to commit the charged crime, may be admissible for other relevant purposes, including, among other things, motive, intent, absence of mistake or accident, identity, or a common plan or scheme. *State v. Slaughter*, 316 S.W.3d 400, 403 (Mo.App. 2010).

Here, the evidence of Sykes's lies about his prior convictions tended to prove Sykes's intent and motive: that he acted at least recklessly in exposing D.M. to HIV without her consent to fulfill his desire to engage in unprotected sexual conduct with D.M. Sykes not only failed to tell D.M. that he was HIV positive, he affirmatively misled her into thinking that he was not HIV positive by lying about the reason for his prior convictions, which would have alerted her to the fact that he was HIV positive. This shows that Sykes acted not only recklessly, but purposely—that it was his "conscious object" to expose D.M. to HIV. § 562.016.2, RSMo 2000. Recklessness is established by evidence that the defendant acted purposely. § 562.021.4, RSMo 2000.

■ Further, Sykes's deception also tended to prove his motive—his desire to engage in unprotected sexual conduct with D.M. despite being HIV positive, which he was able to satisfy by lying to her about his prior convictions. Evidence of motive is logically relevant and admissible, even if motive is not an element of the offense, and the State has wide latitude to develop evidence of motive. *State v. Pickens*, 332 S.W.3d 303, 316 n. 9 (Mo.App.2011). Sykes's lie to D.M. concerning the nature of his prior convictions prevented D.M. from knowing that Sykes was HIV positive. Thus, the evidence of Sykes's prior convictions explained Sykes's lie, which was relevant to Sykes's intent and motive, and was admissible. Even if inadmissible, the most cursory review of the evidence presented in this case reveals no manifest injustice or miscarriage of justice. Sykes, therefore, cannot show that " 'the error that was not raised on appeal was so substantial as to amount to a manifest injustice or a miscarriage of justice.' " *Johnson*, 330 S.W.3d at 142 (citation omitted).

Sykes argues that his attempt to mislead D.M. regarding his HIV status was not relevant because his intent to conceal his status was not an element of the crime. He even quotes this court's memorandum on direct appeal stating that Sykes's intent to conceal his status was not "essential for conviction" as it was not an "essential ele-

ment." But, "essential for conviction" is not the same as "relevant and admissible." Here, evidence of Sykes's prior convictions, including his attempts to mislead D.M. and D.M.'s motivation to first lie on Sykes's behalf and then recant those lies, were all relevant to establish how D.M. had not consented to sexual activity with Sykes knowing of his HIV status. That knowing consent was an essential element of the offense and was the primary contested issue at trial. § 191.677.1(2). Section 191.677.1(2) says, "It shall be unlawful for any individual knowingly infected with HIV to ... [a]ct in a reckless manner by exposing another person to HIV *without the knowledge and consent of that person to be exposed to HIV* [.]" (Emphasis added).

Moreover, to the extent that Sykes argues that, because he stipulated that he knew he was HIV positive and that he knew he was required by law to inform his partners of his HIV positive status, it was not "permissible to admit highly prejudicial evidence of [his] prior convictions to establish elements to which there [was] no actual controversy." Sykes, however, cannot restrict the State's ability to prove its case as it sees fit. The State carries the burden of persuasion as well as the burden of production to make a submissible case. A stipulation ought not prevent the State from producing admissible evidence as it deems necessary to make a compelling case for the jury. As noted above, the evidence of Sykes's prior convictions were relevant to show that D.M. had not consented to sexual activity with Sykes knowing of his HIV status.

Appellate counsel's decision not to raise the evidence of other crimes issue was "reasonable and sound" strategy. The evidence of Sykes's prior convictions was admissible to prove intent, motive, and lack of consent. The circuit court, therefore,

did not clearly err in denying Sykes's Rule 29.15 motion. We affirm the circuit court's judgment.

All concur.